State of Oregon, 4–71 Civ. 392; State of Washington, 4–71 Civ. 395; Hawaii, 4–71 Civ.

---

## In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.\*

### No. 4–71 Civ. 435.

United States District Court
D. Minnesota,
Fourth Division.

March 21, 1974.

See also, D.C., 410 F.Supp. 680.

397; Utah, 4–71 Civ. 398; Kansas, 4–71 Civ. 400; and State of California v. Chas. Pfizer & Co., Inc., 4–71 Civ. 399, 4–71 Civ. 393, 4–71 Civ. 401.

**670**

Lee Johnson, Atty. Gen., Salem, Ore., for State of Oregon.

Ferguson & Burdell, Seattle, Wash., for State of Washington.

Law Offices of Joseph L. Alioto, San Francisco, Cal., for States of Hawaii and Utah.

Thomas M. O'Connor, City Atty., San Francisco, Cal., for City and County of San Francisco; County Counsel's Office, Los Angeles, Cal., for County of Los Angeles; Evelle J. Younger, Atty. Gen., San Francisco, Cal., for State of California.

Curt T. Schneider, Atty. Gen., and Crane, Martin, Claussen, Hamilton &
Barry, Topeka, Kan., for State of Kansas.

Donovan, Leisure, Newton & Irvine, New York City, and Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for American Cyanamid Company.

Gibson, Dunn & Crutcher, Los Angeles, Cal., Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., and Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Pfizer Inc.

Winthrop, Stimson, Putnam & Roberts, New York City, and Faegre & Benson, Minneapolis, Minn., for Bristol-Myers Co.

Cravath, Swaine & Moore, New York City, and Faegre & Benson, Minneapolis, Minn., for Squibb Corporation and Olin Corporation.

Covington & Burling, Washington, D. C., and Faegre & Benson, Minneapolis, Minn., for the Upjohn Company.

## MEMORANDUM OPINION APPROVING SETTLEMENTS

MILES W. LORD, District Judge.

The parties have moved the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for approval of the proposed settlement of these class actions.

### BACKGROUND

These six class actions are a part of the more than 150 actions brought against defendants since 1968 alleging that defendants, beginning in 1953, conspired to and did monopolize the manufacture, sale and distribution of broad spectrum antibiotics and broad spectrum antibiotic products (BSA),[1] and conspired

---

1. Broad Spectrum Antibiotics are antibiotics which are effective against a wide range of harmful micro-organisms including gram positive and gram negative pathogenic micro-organisms, rickettsiae, viruses, spirochetes and protozoa. The first BSA encompassed within the definitions in the complaints herein was chlortetracycline, introduced in December of 1948, by American Cyanamid under the trade name Aureomycin. In March of 1950, Pfizer's

oxytetracycline was introduced under the trade name Terramycin. In 1953, Cyanamid introduced its first tetracycline product line under the trade name Achromycin, which was followed by Pfizer's Tetracyn in January of 1954, Bristol's Polycycline in April of 1954, Squibb's Steclin in September of 1954 and Upjohn's Panmycin in October of 1954. All of these product lines, except for Aureomycin and Terramycin, are tetracycline formulations.

to restrain trade in the manufacture, sale and distribution of BSA within interstate and foreign commerce.

All of the 150 actions related in some fashion to the 1958 F.T.C. hearing and to the 1961 criminal indictment against certain of the defendants.

### A. F.T.C. and Criminal Actions.

Commencing in 1953, the Federal Trade Commission initiated an investigation into the business conduct, practices and management of corporations engaged in the production, sale or distribution of antibiotic drugs. In July of 1958, the Federal Trade Commission issued a complaint charging the defendants, American Cyanamid Company, Chas. Pfizer & Co., Inc., Bristol-Myers Company, Olin Mathieson Chemical Corporation (Squibb), and the Upjohn Company, with unfair methods of competition and unfair acts and practices in the sale of antibiotics, all in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).[2] Following the taking of evidence, the hearing examiner filed his opinion, which was taken to the full commission and the commission required compulsory licensing under the patents held for the purpose of making tetracycline.[3] This decision was appealed to the United States Court of Appeals for the Sixth Circuit, which Court in June of 1966 handed down its decision. *American Cyanamid Co. v. F. T. C.*, 363 F.2d 757 (6th Cir. 1966). The Court required the taking of additional testimony and the matter was remanded to the commission. Following the testimony, a new hearing examiner rendered his opinion, which was again taken to the full commission. The commission rendered its opinion, which was again appealed to the Sixth Circuit and in September of 1968, the Court handed down its decision holding the testimony of Examiner Lidoff supported the findings of misconduct before the Patent Office and justified the

compulsory licensing order of the commission. *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453.

In 1961, an indictment was returned by the Grand Jury of the Southern District of New York (61 Cr. 772), naming Pfizer, Cyanamid and Bristol and the chief executives of each company as defendants and additionally naming Squibb and Upjohn as co-conspirators. The indictment charged that the defendants, pursuant to a conspiracy, had misled the Patent Office, used patents to exclude competitors and fix prices.

Trial of the criminal action took place in November and December of 1967, before a jury, and a verdict of guilty on all counts as to the defendants Pfizer, Cyanamid and Bristol was returned. A judgment of conviction was appealed and was reversed with directions for a new trial. *United States v. Chas. Pfizer & Co.*, 426 F.2d 32 (2d Cir. 1970). The matter was retried before Judge John Cannella, sitting without a jury. On November 30, 1973, Judge Cannella returned his verdict, finding each defendant not guilty on all counts of the indictment. *See, United States v. Chas. Pfizer & Co.*, 1972–73 Trade Reg.Rep. § 74812.

### B. The Civil Actions.

Following return of the jury verdict in the criminal proceedings of December 1967, more than 150 civil actions were filed against the defendants, claiming treble damages on account of alleged antitrust violations in the sale of broad spectrum antibiotic drugs. A large number of those actions, including the actions filed by the six states herein, were brought as class actions under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

On November 19, 1968, the Judicial Panel on Multidistrict Litigation transferred all of the broad spectrum antibi-

---

**2.** F.T.C. Docket No. 7211.

**3.** Conover Patent No. 2,699,054, Duggar Patent No. 2,482,055, Niedercorn Patent No. 2,609,-329.

otic cases filed throughout the United States to the Southern District of New York, pursuant to 28 U.S.C. § 1407, where they were consolidated for coordinated pretrial discovery before Judge Inzer B. Wyatt. *In re Antibiotic Drugs*, 295 F.Supp. 1402 (Jud.Pan.Mult.Lit.1968).

Under date of February 6, 1969, (later modified under date of May 9, 1969), the defendants made a written offer of $100,000,000 in settlement of all of the claims of states, counties, cities and their political subdivisions and agencies, and any other government entities, excluding the federal government, arising out of their purchases or payments for broad spectrum antibiotics, as well as the claims of wholesalers, retailers and individual consumers arising out of such purchases, including the claims of states as parens patriae on behalf of their citizens, or on behalf of classes including the state as a consumer and all other consumers in the state.

The settlement offer was accepted by most of the plaintiffs, including 43 state plaintiffs, and on May 26, 1969, Judge Wyatt entered an order which began the administration of the proposed settlement.[4] That order provided that any of the plaintiff states not accepting the offer of settlement could, by notice, exclude itself and the classes which it proposed to represent from the proposed settlement.

The six states herein plus the State of North Carolina rejected this settlement offer and elected to continue with the litigation. The settlement offer was reduced proportionately to approximately $85,000,000.

By Pretrial Order No. 1, dated February 24, 1970, Judge Wyatt divided the non-settling cases into four categories: (1) city, county, state and the United States Government cases (CCS cases); (2) farm cases; (3) miscellaneous cases; and (4) hospital cases. The counsel of record for each category of cases were designated as a committee of counsel. Each committee of counsel selected five of its members to participate on a Plaintiffs' National Steering Committee (PNSC), which was charged with the coordination of the plaintiffs' discovery efforts.

The administration of the $85,000,000 settlement accepted by 43 of the states and certain other classes became increasingly burdensome upon Judge Wyatt. On December 2, 1970, the Judicial Panel, with Judge Wyatt's consent and recommendation assigned the 60 actions remaining in a litigating status to this Judge under special assignment to the Southern District of New York.[5] Subsequently, these actions were transferred under 28 U.S.C. § 1404(a) to the District of Minnesota.[6] Pretrial Order No. 1 (with slight modifications) remained in effect.

### THE CLASSES

#### A. The Institutional Classes.

On February 9, 1971, this Court issued Class Action Order No. 71–4[7] which determined that the actions of the six states herein were to be maintained as class actions pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, with the named plaintiffs in each action to act as the representative party on behalf of a class consisting of,

The State, its departments, agencies, hospitals, institutions and political subdivisions and all counties, cities and other governmental entities within the state (other than those of the federal government), including without limitation hospital districts, hospitals and

---

**4.** *See, State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

**5.** *In re Antibiotic Drugs*, 320 F.Supp. 586 (Jud. Pan.Mult.Lit.1970).

**6.** *In re Antibiotic Antitrust Actions*, 333 F.Supp. 299 (S.D.N.Y.1971).

**7.** *In re Antibiotic Antitrust Actions*, 333 F.Supp. 267, 272 (S.D.N.Y.1971).

other institutions supported in whole or in part by state, county, city or local governmental funds, which purchased or paid for broad spectrum antibiotic products during the period 1954 through 1966.

Class Action Order No. 71–9, 333 F.Supp. 274, directed that notice be given to the members of the institutional class in the form and manner prescribed by that order and found by the Court to be the best notice practicable under the circumstances. Pursuant thereto, in March of 1971, notice was provided by mail to institutions within each non-settling state, advising them of the pendency of the class action on behalf of the institutions within the state and requiring them to make an intention to state a claim.

### B. The Consumer Class.

Besides moving for an institutional class, the state plaintiffs, in February of 1970, moved that the Court establish a "fluid" class of consumers within the boundary of each state.[8]

In their written briefs and in oral argument, defendants vigorously opposed the establishment of a consumer class claiming that such a class would be unmanageable and that the allowance of a "fluid" class recovery is a denial of due process, and that they were entitled to confront each member of the consumer class individually on the question of damages. Plaintiffs, on the other hand, argued that the party representing the consumer class should be entitled to represent and obtain a recovery for the entire class without the necessity of each member coming forward on the issue of damages. Plaintiffs further argued that the class was manageable. (The manageability and fluid class questions will be discussed more fully infra.)

On February 10, 1971, Class Action Order No. 71–5 directed plaintiffs to answer certain interrogatories regarding manageability of a consumer class and also requested defendants to respond thereto.

On April 13, 1971, by Class Action Order No. 71–11, filed separately in each state action, the Court determined that the non-settling state actions were to be maintained as class actions pursuant to Rule 23, Federal Rules of Civil Procedure,[9] with the named party as representative plaintiff on behalf of a class comprised of

Purchasers within the state who, during the period 1954 through 1966 purchased or paid for broad spectrum antibiotic products for human consumption from public or private hospitals or from pharmacies, drugstores or other retail outlets, including the state, on account of payments made therefor for the benefit of recipients of welfare programs.

Class Action Order No. 71–11 further ordered that the state as the representative party could proceed to prove liability and the amount of damages for the entire class. Defendants' request that consumers be made to return a claim form with the amount of their proposed damages before trial was denied.

Class Action Order No. 71–11 directed that notice be given to the members of the consumer class defined therein in the form and manner prescribed by that order and found by the Court to be the best notice practicable under the circumstances. Pursuant thereto, in May of 1971, notice was provided by mail to each household in the non-settling states advising the residents of each state of the pendency of a class action on behalf of consumers within the state, and that they would be included in the action unless they filed a timely written election to be excluded.

Approximately nine million notices were mailed to "occupant" of each household as determined by the tax rolls of each state. Close to 10,000 "opt outs"

---

8. The states, at that time were also moving for and had brought their actions under a parens patriae theory which was later abandoned.

9. In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 291 (S.D.N.Y.1971), mandamus denied sub nom., Pfizer, Inc. v. Lord, 449 F.2d 119 (2d Cir. 1971).

were received plus many inquiries concerning the litigation.

## DISCOVERY

Throughout this litigation, plaintiffs' discovery has been organized and carried out by the PNSC for use as appropriate for all of the litigants.

Sets of interrogatories have been promulgated by all parties and a mass of information has been furnished as requested by these interrogatories. Commencing in the early part of 1971, motions for production of documents were propounded and argued to the Court. Pursuant thereto, many hundreds of thousands of documents were deposited by the defendants in the document depository which had been established in New York City. The plaintiffs have reviewed the material placed in the depository, copied in excess of a quarter of a million documents which they felt to be of use to them, and transferred those documents to the plaintiffs' depository in Los Angeles for further review.

Thousands of other documents for which the defendants claimed privilege were submitted to three Special Masters for review and determination.

Early in the proceedings, the State of California retained a group of economic experts to prepare a damage study relating to its claims and the claims of those for whom it acted in a representative capacity. The other states retained the assistance of an expert economist and an expert statistician to perform similar studies for them, and, at the request of the Court, after analysis, adopted many of the procedures followed by the California experts, and much of the material of national significance which had been prepared by them. The states prepared individual damage studies, and submitted them to the defendants for review. During 1971 and 1972, conferences were conducted by the Court-appointed economist and statistician, which resulted in an exchange of views and clarification of the damage issues among the parties.

As a result of those conferences, the plaintiffs' damage studies were amended, and the defendants filed extensive responses thereto.

Following the process of document review and categorization referred to above, commencing in February of 1973, the plaintiffs conducted more than 130 depositions of defendants' personnel and other persons having relevant knowledge concerning the matters in litigation. These depositions continued through the month of July and thereafter and these plaintiffs were actively engaged by the week and by the day in taking depositions in all parts of the United States. Prior to the plaintiffs' deposition program, and concurrently therewith, the defendants had taken in excess of 200 depositions of plaintiffs' personnel and others. These depositions, taken by defendants, included trips to Australia, Hong Kong, England, France and Belgium to depose various witnesses.

Pursuant to an Order of this Court, the plaintiff states (and certain other plaintiffs) compiled and filed a trial brief consisting (with appendices) of over 600 pages. The brief was filed on August 17, 1973 and answer responses were filed within sixty days by each defendant. In August of 1973, this Court announced its intention of starting the trial of the CCS cases by early October of 1973. On October 17, 1973, Memoranda of Agreement were signed by all parties in the six state actions and presented to the Court.

## THE SETTLEMENT

The terms and conditions of the proposed settlement are set forth in the parties' Memoranda of Agreement dated October 17, 1973. In essence, the settlements call for the payment of an amount equal to about $35,000,000 to the six states for the full and final settlement of all claims arising under the six state actions.

The settlements are segmented into proposals relating to institutional purchases, vendor reimbursement for wel-

fare purchases, and purchases by individual consumers. The proposed settlement figures in each category for each state are as follows:

California
| | |
|---|---|
| Institutions | $ 3,915,000 |
| County of Los Angeles | 1,090,000 |
| City and County of San Francisco | 275,000 |
| Welfare Reimbursements | 1,956,000 |
| Consumers | 20,904,000 |
| Total | 28,140,000 |

Hawaii
| | |
|---|---|
| Institutions | 190,000 |
| Welfare Reimbursements | 7,000 |
| Consumers | 154,000 |
| Total | 351,000 |

Kansas
| | |
|---|---|
| Institutions | 735,000 |
| Welfare Reimbursements | 213,000 |
| Consumers | 2,622,000 |
| Total | 3,570,000 |

Oregon
| | |
|---|---|
| Institutions | 355,000 |
| Welfare Reimbursements | 78,000 |
| Consumers | 1,744,000 |
| Total | 2,177,000 |

Utah
| | |
|---|---|
| Institutions | 105,000 |
| Welfare Reimbursements | 53,000 |
| Consumers | 985,000 |
| Total | 1,143,000 |

Washington
| | |
|---|---|
| Institutions | 690,000 |
| Welfare Reimbursements | 279,000 |
| Consumers | 3,266,000 |
| Total | 4,235,000 |

The settlement agreements call for an amount lesser than above to be paid to the consumer but the agreements also call for payment of an amount equal to 9% interest for one year on the entire fund for each state. The 9% interest figure is to be added on to the amounts allocated for consumers. The figures above represent the total amount to be paid to each state for each category. The money is to be deposited with the Court 9 months from the date of the agreements or upon the date that the settlement becomes final, whichever is later.

The amount received for the institutional class and the welfare reimbursements are nearly identical to the amounts offered under the early settlement. The amount offered to consumers is substantially more.

While making the offer, the defendants deny all liability whatsoever and the Court makes no finding thereof.

*Notice of Settlement.*

On October 31, 1973, this Court entered Class Action Order No. 73–36 in each of the pending state cases, directing that notices in the form and manner prescribed by that order and found by this Court to be the best notices practicable under the circumstances be mailed to each of the institutions which had made a claim in these actions and to the individual members of the consumer classes in each state, advising them that a hearing would be held in Minneapolis, Minnesota, on February 13, 1974, to determine the fairness and adequacy of the proposed settlement.

Pursuant to Class Action Order No. 73–36, written notices were mailed in each state to each institution which had theretofore made a claim and to each individual household within each state, advising them of the hearing.

**CRITERIA FOR APPROVING CLASS SETTLEMENTS**

As stated in the Court's Memorandum approving the farm cases' settlement in these actions,

The legal standards to be considered in determining whether a proposed settlement of a class action should be approved are discussed in *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 740–44 (S.D.N.Y.1970), *aff'd* 440 F.2d 1079 (2d Cir. 1971), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *See also, In re Brown Company Securities Litigation,* 58 F.R.D. 19, 36–71 (W.D. Okl.1972); *Feder v. Harrington,* 58 F.R.D. 171, 174–77 (S.D.N.Y.1972); and *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 34 (3d Cir. 1971), *aff'd* 322 F.Supp. 834 (E.D.Pa. 1971). Whether a class action settle-

ment is fair, adequate and reasonable is within the Court's discretion. Although there is a public policy encouraging settlement of legal disputes, the Court supervising a class action has the responsibility to protect members of the class who are not before the Court from a collusive or improvident settlement. The Court, however, is generally reluctant to substitute its judgment for that of competent counsel, experienced in complex antitrust litigation such as this, who have arrived at a settlement only after arm's length negotiations.

As outlined supra, the Court has a very large record to refer to in apprising itself of the facts necessary to make a determination of the fairness and adequacy of the settlement. This includes very extensive trial briefs from both sides, economic briefs and damage studies from both sides, transcripts of over three hundred depositions and a personal knowledge and involvement with the litigation since 1970. *Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1967); *Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp.,* 323 F.Supp. 364 (E.D.Pa.1970).

In evaluating these proposed settlements, the Court has considered the potential expenses of further litigation; the plaintiffs' likelihood of success on the merits balanced against the amount offered in settlement; the experience of counsel; and the extent of support for the settlement from class members. The Court finds that upon consideration of all relevant factors the proposed settlement of this class action is fair, adequate and reasonable.

### A. Potential Expense of Further Litigation

Although the Court ordered these cases to trial in October of 1973, there is no doubt that further litigation would greatly increase expenses for the class. The trial itself would take at least three months and probably longer. After the trial on liability, continuation or new trial on damages would be necessary should the plaintiffs prevail. No matter who prevailed, appeals would most assuredly follow.[10] If the plaintiffs were to prevail at trial and all subsequent appeals, there is no guarantee that they would receive a larger sum. There would also be a great delay in receiving any sum which they might finally be awarded. With the acceptance of the settlement, the members of the class are receiving a very substantial recovery now, without bearing the risk and expense of further litigation. *Ladd v. Brickley,* 158 F.2d 212 (1st Cir. 1946), *cert. denied,* 330 U.S. 819, 67 S.Ct. 675, 91 L.Ed. 1271 (1947); *Neuwirth v. Allen,* 338 F.2d 2 (2d Cir. 1964); *Upson v. Otis,* 155 F.2d 606 (2d Cir. 1946).

### B. Likelihood of Plaintiffs' Success.

The Court is, of course, aware of the comments of Judge Wyatt concerning the chances of plaintiffs' success in this case. *State of West Virginia v. Chas. Pfizer, supra.* The Court is also aware and takes judicial notice that the proposed settlement amount for these states equals all of the money originally presented for the consumers for 43 states under the "Alabama Plan" of distribution of the first settlement. With the exception of the institutional classes, however, this Court is reluctant to compare the proposed settlements before the Court with that which occurred in 1969. Since the time of the original settlement offer, massive discovery has taken place, a motion for a fluid class has been granted, and over 1,000,000 documents have been turned over. Plaintiffs have expended a tremendous amount of money in an effort to bring these cases to trial. The institutional classes have re-

---

**10.** Defendants have already appealed (by attempted mandamus) five times in this litigation: *Pfizer, Inc. v. Lord,* 447 F.2d 122 (2d Cir. 1971); *Pfizer, Inc. v. Lord,* 449 F.2d 119 (2d Cir. 1971); *Pfizer, Inc. v. Lord,* 456 F.2d 532 (8th Cir. 1972); *Pfizer, Inc. v. Lord,* 456 F.2d 545 (8th Cir. 1972); *Bristol-Myers Co. v. Lord* (8th Cir. 1973).

ceived close to the same results as were offered under the "Alabama Plan" and all parties agree that this is a fair and adequate settlement. This Court adopts the opinion of Judge Wyatt in *State of West Virginia v. Chas. Pfizer & Co., supra,* in determining whether the settlement is fair, adequate and proper for the institutional class members. Damages are based upon a 40% markup for the institutions involved over the relevant time period. Judge Wyatt concluded that the proposed settlement was fair under the "Alabama Plan" and this Court concurs, as respect to the proof of damages and maximum recovery under the original settlement.

The consumers, however, are a different matter. Substantial increases (approximately $15,000,000) are offered to the consumers in these actions as opposed to the original "Alabama Plan." It is important to note at the onset that a very substantial increase in expenses has taken place since the original offer. The parties have had the benefit of a wealth of discovery plus overwhelming economic data. To compare the 1969 consumer settlement for the other 43 states with the consumer settlement before this Court is tantamount to comparing apples to oranges. This Court must look at the potential success of further litigation as opposed to the recovery of the class members based upon the facts it has before it *now,* not the facts that were before the Court in 1969.

The present settlement is based upon damage formulae which include such items as expense for administration; in and out migration of residents within the state; an overcharge ratio based on three separate and theoretically different economic reports; guesses at how many consumers would assert claims and many other factors.[11] The Court also has its own economic experts and the combined resources of three different damage theories. Based upon all of the facts, figures, complicated damage formulae, economic briefs, statistics and other information that the Court could compile, the Court finds that the amount proposed for consumers represents approximately 20–25% of the manufacturers' value of the drugs in question for purchases over the relevant time period.

Counsel arguing for the proposed settlement have represented to this Court that the amount of the settlement represents an amount equal to single damages. The same counsel represent that this is a very good settlement under these circumstances. This Court must weigh the very substantial offers of the defendants as they compare to the pitfalls and frustrations of further litigation. This litigation presents several legal difficulties to the plaintiffs. Without determining them, the Court finds that the following issues raise serious problems to the plaintiffs' ultimate success: (a) the fluid class problem, (b) the pass on defense, (c) consumer markup, (d) out migration and deceased persons, and (e) recent developments in the law.

The fluid class problem will be discussed separately infra.

The defendants have contended throughout that the ultimate consumers are barred from recovering because of the holding of the United States Supreme Court in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The plaintiffs, on the other hand, contend that the purchases by consumers are equivalent to the cost-plus exception referred to in *Hanover* and rely upon the decision in *State of West Virginia v. Chas. Pfizer & Co., supra.*

The plaintiffs contend that the consumers, assuming liability is proved, are entitled to recover damages based upon the full amount of their purchases from retail pharmacists, arguing that the markup by the retailers was a foreseeable consequence of the defendants' activity. The defendants contend that, as-

---

11. See, memoranda in support of proposed settlement, particularly that of Kansas, Washington and Oregon.

suming liability is proved, their responsibility for damages should be based only upon the amounts actually charged by them to wholesalers and retailers.

One of the most significant issues raised by the defendants concerned the right of the representative party in each state to recover for persons who had moved away from the state and could not be located, and for deceased members of the class. The defendants have conducted extensive surveys and samples in the litigating states in an attempt to determine the percentage of potential class members who had migrated from the state, leaving no forwarding address, as well as those persons who had purchased the drugs in suit, had died and whose estates had been closed. In most states, the defendants' surveys indicated that the percentage of out migrants and deceased persons ran from a low of 20% to a high of 28%.

Recent development in government actions include the acquittal of Pfizer, Cyanamid and Bristol on criminal counts similar to those which plaintiffs have alleged constituted acts in furtherance of the combination and conspiracy. The effect of this acquittal, however, is somewhat lessened by plaintiffs' disavowal during the course of the pretrial proceedings of an intent to rest their liability case merely on the prima facie effect of the criminal conviction. Moreover, the burden of proof in civil antitrust damage actions is substantially less than the "beyond a reasonable doubt" standard borne by the government in its criminal action.

The Court is not required to, nor does it, rule upon any of the above issues. The very purpose of a compromise is to avoid a determination of sharply contested and dubious issues. *In re Prudence Co.,* 98 F.2d 559, 560 (2d Cir. 1938). Suffice it to say these particular issues could easily lead the parties to several years of future litigation. While not deciding the issues, we must note them and recognize that they would be substantial roadblocks in the quick and successful resolution of the action by the plaintiffs.

The proposed settlement is very substantial for the consumers. In weighing the amount offered now as opposed to the difficulties inherent in the ultimate success of the suit, the Court finds that the proposed settlement is in all respects fair, adequate and proper.

### C. Recommendation of Counsel.

The history of the negotiations for these settlements is spelled out in plaintiffs' and defendants' Memoranda in Support of the Proposed Settlements. These negotiations encompassed many meetings and bargainings by both sides.

The recommendation of experienced antitrust counsel is entitled to great weight. *Schleiff v. Chesapeake and Ohio Ry. Co.,* 43 F.R.D. 175 (S.D.N.Y.1967). *See also, Glicken v. Bradford,* 35 F.R.D. 144 (S.D.N.Y.1964). We have observed these counsel for more than three years during the conduct of these actions. Every member of the committee of counsel representing these states is not only an experienced antitrust lawyer, but a respected member of the bar. This Court feels that they are very knowledgeable and competent people and relies a great deal upon their recommendation.

The Court finds that the negotiators for the parties acted independently and in pursuit of the best interests of their respective clients throughout the length and vigorous course of the negotiations. All of the negotiations were conducted at arms length and against a background of actual trial preparation.

### D. Extent of Support for Settlement by Members of the Class.

As mentioned supra, over nine million notices addressed to "occupant" in the six states were mailed giving the consumers notice of the proposed settlement and indicating that the individuals could appear either in person or by writing to object to the settlement. Two formal objections were received. The first objector maintained that the Court should not approve the settlement until a for-

mal plan of distribution had been presented to the Court. The objection was primarily concerned with the method to be used in guaranteeing that the consumers fund went, in fact, to the consumers and not to the states involved.

This Court fully intends that the money offered to the consumers should go to them. When an order is entered dismissing the defendants, the Court will, of course, retain jurisdiction and supervise the distribution of the funds. The Court has approved a Special Master who will supervise the day to day management of the settlements. Preliminary meetings among counsel and the Court in regard to this problem have already occurred. Claim forms will be mailed to each household in the states so that consumers may apply for their share of the settlement. Both plaintiffs and defendants have made extensive use of the computer in these cases and plaintiffs will continue to do so, where and when appropriate, in the distribution of the funds.

Several hundred inquiries were made about the settlement; none of these objected to the settlement and all that warranted response were given them.

The Court feels that the support for the settlement by the class has been substantial.

## THE FLUID CLASS AND MANAGEABILITY

During the course of this litigation much has been said and written concerning the concept of a fluid class. Defendants have argued that the fluid class should not exist, that it is a form of blackmail and amounts to no more than a "pot of gold" for the lawyers involved. In forming these classes, this Court stated

> The most misleading of their arguments characterizes a classwide recovery as a "pot of gold" which the plaintiffs and their counsel are somehow not entitled to receive. If we assume that a price-fixing conspiracy is proven at trial, however, the defendants will

certainly have no right to the "pot of gold" created by their illegal activities. *Opinion No. 2, Consumer Class Actions,* 333 F.Supp. 278, 287 (S.D.N.Y. 1971).

Since this settlement will be approved and no liability is admitted to or found, the Court need make no further findings as to properness of a fluid class. The most frequent objection to a fluid class, however, is that they are unmanageable. The Court finds that these cases are and were at all times manageable.

From the outset, it was contemplated that these actions would be tried. However, the Court has encouraged settlement, because not only would this entail a saving of judicial resources but also because there are corresponding advantages to defendant companies whose management necessarily would be involved in a lengthy trial and to the plaintiffs who will achieve a certain and earlier recovery. A point to be emphasized, however, is that the structure of these large national classes did not require different treatment, depending upon whether these actions were to be litigated or settled.

Under both Judges who have tried these cases, counsel have cooperated and worked through a committee system. This has not only assured manageability and smoothness in the day to day running of these actions but has also assisted in giving the plaintiffs a wide geographic representation.

The Court also notes that large consumer classes represented by their States' Attorneys General ordinarily will have the ability to obtain economic expertise; that was certainly the case in these actions. In this particular instance, all of the states prepared extensive and coordinated economic briefs. Defendants, likewise, were able to rely upon expert economic advice in framing their position as to the appropriate parameters of the consumer market. Throughout these cases, the Court has found it useful to have the plaintiffs' and the defendants' economists consult with an economist and statistician ap-

pointed by the Court for the purpose of coordinating economic and statistical studies. This has assisted in translating market information to a common base. Many potential problems attributable to different methods of presenting data drawn from the same base were thus avoided.

As mentioned above, this Court fully intends that the money being paid for the consumers in this action will go to them. With the aid of modern computer techniques and use of available resources, the size of the classes and the amount of money ceases to be an insurmountable problem. Hard work and imagination will be required but these two requirements are not new to any of the parties or to the Court in this litigation; nor should they be new to any parties before any Court in any litigation. As this Court stated in approving the farm settlements in this litigation,

> Even though the Court has found the classes would be manageable in the specific context of these actions, it notes generally that class size alone should never be used to permit wrongdoers to retain the fruits of their unlawful actions. Neither the asserted complexity of the issues nor the magnitude of the claimants and the asserted damages can be allowed to preclude the fair administration of justice. A judicial system which places a higher premium on convenient administration than on redress of grievances soon ceases to be just. Moreover, from the viewpoint of judicial administration there probably is greater efficiency achieved on a "per claim" basis in a major national class action than through dealing with claims on a piecemeal basis.[12]

Based upon all of the considerations mentioned above, including the entire record, the Court finds the proposed settlement to be fair, adequate and proper. The amount of money offered is very substantial. Plaintiffs' chances of suc-

cess in the trial of this litigation are wrought with pitfalls. Even if success were to be obtained, any recovery would be years away and achieved at a great deal of added expense to the members of the class. Experienced counsel negotiated at arms length for the settlement and all recommended it to the Court. Many members of the class have expressed their interest and approval in the settlement while only two have objected.

Orders and judgments approving the settlement will be entered without delay.

---

12. This is a generality relating to manageability since the Court has already concluded that

no finding of liability on the part of defendants is made in this opinion.