See also, D.C., 410 F.Supp. 659.

In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS, 4–71 Civ. 435.

MIDWEST VETERINARY SUPPLY et al., Plaintiffs,

v.

AMERICAN CYANAMID et al., Defendants.

No. 4–69 Civ. 75.

United States District Court, D. Minnesota, Fourth Division.

July 3, 1975.

Johnson, Thompson, Klaverkamp & James, Minneapolis, Minn., Carroll, Cronan, Roth & Austin, Minneapolis, Minn., Walter E. Riordan, P.A., Minneapolis, Minn., for Midwest Veterinary Supply, Inc., Counsel.

## MEMORANDUM AND ORDER APPROVING CLAIM RECOMMENDATIONS, PLAN OF DISTRIBUTION AND AWARD OF ATTORNEYS' FEES AND COSTS

MILES W. LORD, District Judge.

On May 2, 1975, a hearing was held before this Court pursuant to Class Action Order No. 75–39 for the purpose of considering the validity and propriety of all claims filed against the settlement fund in this action and the proposed plan of distribution, including the award of attorneys' fees and costs. The Court, having reviewed and considered all of the recommendations of counsel for the plaintiffs and having heard and considered all of the positions and statements given at said hearing, renders this Memorandum and Order on the allowance of claims, distribution of the settlement fund, and award of attorneys' fees, costs and expenses.

## I.

### BACKGROUND

A. LITIGATION

This action was one of approximately 150 such actions commenced throughout the country in the late 1960's which have borne the consolidated title *In re Coordinated Pre-Trial Proceedings in Antibiotic Antitrust Actions,* No. M19–93A (S.D.N.Y. filed February 24, 1970) 4–71 Civ. 435 (D.Minn. filed August 1, 1971), and Docket No. 10 (JPML). These cases fol-

lowed the commencement of a related criminal action, a Federal Trade Commission action, and Congressional investigations.

It is impossible to set forth a complete description of this or any of these individual antibiotic cases without discussing the history of the entire coordinated proceedings. A review of these consolidated proceedings has already been summarized in part in other opinions rendered by this Court, the District Court for the Southern District of New York, the Judicial Panel of Multidistrict Litigation, the Federal Trade Commission, and the Second, Sixth and Eighth Circuit Courts of Appeal. Therefore, this Court, without seeking to minimize the length or complexity of this litigation, will not herein set forth the entire history of this case in the context of the entire litigation but will summarize those elements of the total litigation particularly relevant to this particular case. For a review of the full background of all these cases, reference is made to the above-cited decisions and other unreported decisions of this Court, particularly, the Memorandum Approving the Plan of Distribution and Attorneys' Fees dated May 1, 1975 in *Doughboy Industries, Inc., et al. v. American Cyanamid Company, et al.*, 410 F.Supp. 680 (D.Minn. 1968). Also, reference is made to Plaintiffs' Memorandum in Support of a Proposed Settlement dated April 18, 1975 which set forth a chronology of the history of these cases with particular reference to this case.

This action was commenced on March 6, 1969 by four wholesale distributors of broad spectrum antibiotic products that were intended for nonhuman use. The Complaint sought to recover damages for injuries suffered by plaintiffs and all others similarly situated as a result of alleged violations of the antitrust laws by the defendants.

On May 7, 1969 this action was transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation for coordinated pre-trial proceedings pursuant to 28 U.S.C.

§ 1407. At that time there were essentially two groups of cases pending in the Southern District of New York. There were those cases in which settlement offers had been made and accepted and those cases which were not included in settlement offers or in which the settlement had been rejected. On December 10, 1970, the Chief Justice of the United States Supreme Court assigned the undersigned to the non-settling cases then pending in the Southern District of New York.

Hearings were held on all class action motions in December 1970 and January 1971. On January 15, 1971, the motion seeking class action certification for this case was granted. This was the first class action established in the then non-settling cases. Notices were sent to all potential members of this class on April 23, 1971. All potential class members were, pursuant to such notice, given an opportunity to exclude themselves from this case or to file a Notice of Appearance by their own counsel.

On August 7, 1971, all "farm cases" not originating in this district were transferred to this district for all purposes pursuant to 28 U.S.C. § 1404(a). This case and other cases originating in this district were remanded to this district by the Judicial Panel on Multidistrict Litigation. Thereafter pre-trial procedures began.

## B. HEARING ON PROPOSED SETTLEMENT

In January 1973, settlement negotiations were commenced between plaintiffs and defendants in this action. Although previous settlement discussions had taken place, no progress toward settlement was made until this time. On February 23, 1973, the parties presented to this Court a proposed settlement for the plaintiff class in this action. This was the first of the litigating cases in which a negotiated settlement proposal was presented to the Court.

On April 26, 1973, following notice to all known potential class members, a hearing was held before this Court on

the proposed settlement. No members of the class appeared in opposition to the settlement. Counsel for both plaintiffs and defendants assured the Court that the proposed settlement was a result of good faith bargaining at arms length and that it was a fair, adequate and proper compromise of the claims alleged. They therefore recommended acceptance and approval of the settlement.

At the hearing on April 26, 1973, questions arose concerning the status of persons who purchased broad spectrum antibiotics (for non-human use) for resale at wholesale and for other purposes. Additionally, this Court expressed interest as to the amount of attorneys' fees which would be requested by counsel for the class. Hence, although no objections were made to the settlement, it was felt that a second hearing should be held before a ruling on the proposed settlement would be made.

Following the April 26, 1973 hearing and at the Court's suggestion, counsel for plaintiffs submitted their Petition for Attorneys' Fees in which they requested that $750,000 in fees be awarded at that time, along with the costs and expenses incurred up through June 1973. They further informed the Court that such a request for fees was not sought to compensate them for their time and efforts to date but rather such request constituted an advance on their ultimate fees; a request that would not exceed $1,500,-000.00.

On June 22, 1973, a notice was sent to all potential class members. The notice apprised them of the fact that a second hearing would be held on the proposed settlement on July 30, 1973. The notice also apprised all potential class members that those claims which represented purchases for resale at wholesale would be extinguished by this action. The notice further advised potential class members of plaintiffs' counsels' requested attorneys' fees.

As was the case at the original hearing, no objections were made to the settlement at the hearing on July 30, 1973.

With respect to attorneys' fees, counsel for one potential class member, who had previously filed a memorandum questioning the total amount of fees sought, reviewed counsel's time records prior to the hearing and at the hearing withdrew his recommendation that attorneys' fees be limited to 20%. He expressed the opinion that "the services rendered [by counsel] are certainly very high quality and deserve to be compensated very adequately." Other disinterested counsel, at the hearing, similarly expressed the opinion that counsel's services were deserving of substantial award of attorneys' fees.

## C. APPROVAL OF SETTLEMENT

On October 26, 1973, this Court issued Class Action Order No. 73–35 approving the settlement. In so doing the Court took into consideration a number of factors.

This action, involving wholesalers, was faced with the extremely difficult task of proving damages. Since the plaintiffs and members of the class did not manufacture the products they purchased from defendants into another product but simply added a "mark-up" to the products purchased and resold by them to third persons, they were extremely vulnerable to the defense that any damages they suffered as a result of defendants' acts, were in effect passed on to the persons to whom they sold the products. In approving the wholesaler/retailer settlements for the broad spectrum antibiotics purchased for human consumption, Judge Wyatt made the following observation with which the Second Circuit Court of Appeals concurred:

> Without attempting to decide the matter, it appears at first glance to be highly doubtful whether wholesalers or retailers suffered any damage whatever. *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, at 745 (S.D.N.Y.1970) affd., 440 F.2d 1079 (1971), *cert. denied, Cotler Drugs Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

In a settlement context it was not necessary for Judge Wyatt nor is it necessary for this Court to rule on this defense. However, Judge Wyatt's comments, in which this Court generally concurs, were relevant to the question of the reasonableness of the settlement presented for approval.

Aside from the obstacles the plaintiffs faced in establishing their damages, the likelihood of success on the liability issues was unclear and many years away from resolution. None of the prior proceedings involving broad spectrum antibiotics included in any significant way animal feed products or animal health products. The Federal Trade Commission found that two of the defendants had violated the Federal Trade Commission Act. However, the defendants were acquitted of violating the antitrust laws in a criminal action tried in the Southern District of New York. Hence, the ultimate outcome of this litigation was in doubt.

Although the case had been proceeding since 1969 and a great deal of work had been done, the actual trial of this litigation was some years in the future. It was generally recognized at the time the settlement was approved that the so-called "farm cases" would not be tried until the conclusion of the so-called "human consumption cases". The trial of those cases which were not settled commenced in November 1974 and are continuing to this date. No party is at this time willing to predict a reasonable termination date of the current trial. Hence, it can be readily seen that the actual trial of this "farm case" would not have commenced for many years and the resolution of that trial may have taken many years thereafter if one assumes appeals would have been taken.

Finally, this Court believes it highly relevant that, having held two separate hearings on this settlement following detailed notices to all class members, including the amount of the attorneys' fees requested, no objections whatsoever were made to this settlement.

## D. SETTLEMENT ADMINISTRATION

In order to keep abreast of all aspects of settlement administration and to assist counsel and claimants, this Court appointed David Lebedoff, a well-known, highly respected and competent lawyer to serve the Court as special Master in this case. Additionally, the Court was assisted in this regard by Special Master Thomas Bartsh who has been ably serving as Special Master in all of these coordinated cases.

Following approval of the settlement, counsel immediately began working with the Special Masters on procedures for settlement distribution. On December 26, 1973, the amount of the settlement was paid by the defendants to the Clerk of District Court and was immediately, pursuant to bids solicited by class counsel, deposited in interest-bearing term accounts. The money has been redeposited, pursuant to bids and orders of this Court, from time to time. At the most recent hearing on distribution, counsel informed the Court that approximately $446,000. of interest had accrued as a result of these deposits.

The work which followed the December 26th payment took over one year to complete and thousands of man-hours. The Court cannot in this opinion detail the work performed by and at the direction of counsel over this period of time nor is it reasonably feasible to discuss the nature, magnitude or complexity of the problems with which counsel dealt. The following is intended solely as a brief summary of the procedures and methods undertaken by counsel in administration of this settlement, of which this Court is familiar as a result of the report filed by counsel and as a result of counsel's close work with the Court's Special Masters. Any person interested in a more detailed understanding of the settlement administration is directed to the records and documents on file with this Court. In addition, attention is called to the report of the attorneys submitted in conjunction with this settlement.

To assist counsel in the design of the claim form, the examination and review of claims and the design of a plan of distribution, counsel retained Dr. Richard Hoyt, an economist familiar with this litigation and with considerable knowledge and expertise in the utilization of computer technology.

Counsel, working with their economist and the Court's Special Masters, began work on the design of the claim form. Since this was the first of these litigating cases to settle, counsel had no "form" to follow. With counsel's knowledge of the class and the products involved, counsel ultimately presented to the Court for approval a proposed claim form which this Court believed satisfied a number of desirable criteria. The claim form was simple enough to encourage the filing of all legitimate claims, yet was thorough enough to discourage the filing of improper claims. It also provided a means of claim verification. Additionally, the claim form was readily adaptable to computer programming and allowed flexibility for various potential plans of distribution. The claims forms used in the subsequent settlements in the related "farm cases" were substantially identical to the claim form designed in this case.

Following the mailing of the claim form and the accompanying notice to file claims to all potential class members, 201 notices were returned undelivered. With the approval of Special Master Lebedoff and in an attempt to reach as many potential claimants as possible, an investigation was commenced in an attempt to ascertain current addresses for those persons whose claims forms were returned undelivered. As a result of this intensive investigation, counsel report that 195 current addresses were located for the 201 claims originally returned as undelivered. This effort is a commendable example of the exercise of the trust imposed on class counsel for the nonpresent class members.

Upon receipt from the class members, all claims were preliminarily reviewed by one of the attorneys for the class. Notations were made with respect to each claim containing an address or payee change, an error or deficiency, or some other relevant matter which was discovered upon initial review. Those claimants whose claims contained technical defects were given an opportunity to eliminate the defect.

All of the information on the claims forms received, along with the notations of the attorney performing the preliminary review, were committed to a computer program. At the close of the time period for filing claims, May 15, 1974, a computer analysis was made of the claims received. From this analysis it was discovered that 20 of the 211 claims timely submitted accounted for 66.5% of the dollars of purchases claimed, while 149 of the timely filed claims submitted accounted for only 12.5% of the purchased dollars claimed. Based on this data, counsel, with the advice and consent of the Special Master, decided to conduct on-site interviews and record verification of only those top 20 claims. This Court finds that that determination was eminently reasonable under the circumstances.

Thereafter, for purposes of verifying these claims, personal interviews were conducted and record examinations were made of the largest claimants. Additionally, further reviews were made of all other claims to determine errors and inconsistencies. Claims were checked against lists of class members who had requested exclusion from the class and computer checks were made to determine if duplicate claims had been filed in this case or in any of the other "farm cases". Conferences were conducted between counsel in this case and in the related farm cases to assure that all claims were filed in the proper case. Claims which were, in whole or in part, found to be filed in the wrong case, were recommended for transfer to the proper case. In each such instance, hearings were held before the Special Masters and the results of these hearings were incorporated in the reports and recommendations subsequently filed.

In order to verify those claims, other than the top 20, which contained errors, omissions and inconsistencies or which appeared to be duplicative of other claims or filed in the wrong class, extensive correspondence and phone interviews were had with claimants and, in many instances, additional information was requested, received and reviewed.

During this period of time, counsel met frequently with the Court's Special Masters and with their retained economist and examined all data and information acquired throughout the litigation. With the assistance of their economist, counsel explored and analyzed the various potential distribution plans which might be utilized in distributing the proceeds of the settlement.

In March 1975 counsel informed the Court that they were prepared to make their recommendations on the treatment of all individual claims and to propose a plan of distribution including requests and recommendations with respect to attorneys' fees and other costs and expenses. A hearing was ordered for May 2, 1975 and notice was sent to all claimants advising each of the recommended treatment of his claim and counsel's proposed plan of distribution.

## E. THE HEARING OF MAY 2, 1975

At the hearing on May 2, 1975, counsel formally presented their previously filed report and recommendations concerning settlement administration, their proposed plan of distribution, their supplement to petition for expenses and counsel fees, and the petition for reimbursement of expenses by certain plaintiffs. No objections were raised to any of the recommendations or proposals advanced by counsel and, in fact, one class member testified that the settlement was fair and served the interests of justice. This Court can only interpret this total lack of objection or other negative response to the proposals as evidence of the fairness and reasonableness of the recommendations and requests and as an expression of confidence by the class in the exemplary work performed by counsel.

Even though the lack of any objection to the proposals and requests set forth is of some weight, the Court must actually examine these matters and determine if they represent a fair and just distribution of the settlement herein.

## II.

## TREATMENT OF INDIVIDUAL CLAIMS

The report and recommendations concerning settlement administration submitted by counsel contains a statistical analysis of all claims considered and their recommended treatment. The report also contains, by way of a computer printout, counsel's recommendation for treatment of each individual claim submitted. In each instance the amount of the claim recommended for approval is set forth and, if a claim is recommended for disapproval or for approval in an amount other than as originally filed, the basis for such recommendation is noted. This information was conveyed in the notice sent to all claimants whose claims were received and considered. At the hearing on May 2, 1975, counsel moved to amend their recommendation regarding the claim of Lewter & Sons, Claim No. MO1444. This claim was recommended in the report for approval in the amount of $274,293. in total purchases. Counsel's amended recommendation is that the claim be approved in the amount of $274,493.; or an increase of $200.; representing an adjustment in the animal health purchases of the claimant. The Court was informed that this request was made to counsel by the claimant and that the amended recommendation is consistent with the claim as properly filed.

Counsel also apprised the Court that two claims had been filed by the claimant Northland Veterinary Supply Company (Claims Nos. M00026 and M01683). One of the claims was filed by the attorney of record for the claimant in the action and requested that the claimant's check be made payable to the attorney of record and forwarded to him. The

other claim set forth the claim purchases and asked that the check be sent to the claimant. Counsel proposed making the claim check payable to the claimant and mailed to the attorney of record.

Finally, counsel apprised the Court that a notice of levy had been filed on the Clerk of District Court by the Internal Revenue Service against claimant Farm and Ranch Supply, Claim No. M01216. It was suggested that, absent any further development pertaining to this claim prior to distribution, that a portion of the claim check payable to Farm and Ranch Supply be forwarded to the Internal Revenue Service up to and including the amount of the levy.

■ On the subject of claims, the lack of any objection from any claimant is particularly significant. There being no such objections, and having reviewed the claims report including the basis for disallowing certain claims in whole or in part, the Court finds that the report and recommendations on the treatment of individual claims as amended, is reasonable and fair and the Court therefore adopts those recommendations.

### III.

### PLAN OF DISTRIBUTION

The plan of distribution proposed by counsel recommends that all claimed purchases of broad spectrum antibiotic animal health products be multiplied by a factor of 1.25 for purposes of determining each claimant's share of the settlement fund. To determine each claimant's distributive share, it is suggested that the total of his approved animal health purchases, as adjusted, be added to his total approved animal feed purchases and the sum be divided by the sum of all approved animal health purchases claimed, as adjusted, and all approved animal feed purchases claimed. The resulting quotient would then be multiplied by the net settlement fund to determine each claimant's distributive share.

The increase of all animal health products claimed by 1.25 is suggested as a means of accounting for the higher percentage of damages incurred through the purchase of animal health products as opposed to animal feed products as further detailed and described in counsel's proposed plan of distribution.

The "net settlement fund", as defined in plaintiffs Proposed Plan of Distribution, is the amount in settlement paid by the defendant plus all interest accrued, less all costs, expenses and fees paid from such fund.

■ The Court has reviewed the Proposed Plan of Distribution including the economic basis for the increased allocation to animal health products and finds that it is both economically and legally sound. There being no objections raised to this plan, the Court adopts and approves the Plan of Distribution recommended by counsel.

### IV.

### ATTORNEYS' FEES

As previously noted, the attorneys for the class informed the Court and all class members as early as July 1973 that they would seek $1.5 million for attorneys' fees in this action. There have been two hearings held since that disclosure at which this subject has been presented to the Court following notice to all class members. Except for the single instance discussed above, there have been no objections to this requested fee. While the Court deems this significant, this Court also concurs in Judge Harvey's statement in *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 341 F.Supp. 1077, 1089 (E.D.Tenn.1972) that,

> Only the Court is in a position to assess impartially the myriad of factors which relate to the question of the reasonableness of a fee to be paid from a class action settlement fund.

■ The granting of attorneys' fees to plaintiffs attorneys in conjunction with the settlement of a class action antitrust cases is neither statutorily prescribed nor provided for in the Federal

Rules of Civil Procedure. Rather, such authority arises from the general equitable powers of the Court. *See Lindy Brothers, supra* at 1082. This Court has reviewed at length the past and present case law enunciating the standards for determining reasonable fees in cases such as this. Recently, in its Memorandum Approving Plan of Distribution and Attorneys' Fees in the related *Doughboy Industries, Inc. v. American Cyanamid Company, supra*, this Court discussed the legal history and current standards on the subject. The discussion set forth therein is equally applicable to this case. Without repeating what has previously been set forth, it is sufficient herein to note that the judicial search for relevant standards in cases such as this culminated in this Circuit recently in *Gruinin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975). In that case, the Court reaffirmed recent judicial thinking that the fees in cases such as this should bear a significant relationship to the time and nature of work spent by counsel as opposed to the previous emphasis on a percentage approach. In that case, the Court concurred in the analysis adopted by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973) as interpreted in *City of Detroit v. Grinnel Corp.*, 495 F.2d 488 (2nd Cir. 1974) and *Merola v. Atlantic Richfield Co.*, 493 F.2d 292 (3rd Cir. 1974). In so doing, the Court recognized four basic criteria to be utilized when establishing fee awards.

    a.   The number of hours spent in various legal activities by the individual attorneys,

    b.   The reasonable hourly rate for the individual attorneys,

    c.   The contingent nature of success, and

    d.   The quality of the attorneys' work.

In addition, and in conjunction with the foregoing criteria, this Court has taken into consideration those standards discussed at length in the previously mentioned *Doughboy* memorandum.

## A. NUMBER OF HOURS SPENT IN VARIOUS LEGAL ACTIVITIES

Accompanying each counsels' Petition for Attorneys' Fees, counsel have, by affidavit, set forth their total hours spent in this case and have, in large measure, provided the Court with their internal business records and time sheets documenting these hours. In total, counsel have devoted 10,257.3 hours to this case up through April 1975.

The three law firms who have jointly represented the class have provided the Court with a general categorization of the type of activities to which these hours have been devoted. Additionally, they have provided the Court with a classification of attorneys and other legal personnel who have performed the different activities.

The law firm of Johnson, Thompson, Klaverkamp & James, P. A., Minneapolis, Minnesota, which took the leading role throughout these proceedings, classified its time pursuant to the categories utilized in the previously referenced *Doughboy* memorandum, as follows:

Category A—General research, preparation of the response to pleadings, motions, briefs and memos.

Category B—Discovery work on depositions, interrogatories and document and transcript examination.

Category C—Court appearances and preparation, Committee of Counsel meetings, work with defense counsel, and class members.

Category D—Damages, work on development of theories, based on supporting evidence.

Category E—Settlement negotiations, preparation for settlement negotiations, negotiations, obtaining approval of settlement.

Category F—Settlement administration.

Category G—Other.

Time spent by the various members of this firm according to these categories is as follows:

|          | Richard Johnson | Roger Johnson | Other Senior Attorneys | Others |
|----------|----------------|---------------|------------------------|--------|
| Category A | 510.2        | 967.4         | 57.4                   | 42.0   |
| B        | 133.1          | 344.8         | 6.7                    | 1.6    |
| C        | 1,032.7        | 1,028.7       | 9.8                    | 186.5  |
| D        | 69.2           | 152.6         | 36.1                   | 197.3  |
| E        | 199.7          | 327.0         | 26.0                   | 84.7   |
| F        | 161.9          | 404.7         | 5.1                    | 1.1    |
| G        | .0             | .3            | 11.1                   | .1     |
| TOTAL    | 2,106.8        | 3,225.5       | 152.2                  | 513.3  |

The law firm of Carroll, Cronan, Roth & Austin, Minneapolis, Minnesota participated largely in the settlement administration of this case and reports that 2,070.75 hours were spent by them in settlement administration. Of that time, 452 hours were spent by senior members of the firm and 1,618.75 hours were spent by John A. Doyle of their firm and other junior members. Mr. Doyle, an extremely hardworking young attorney, devoted virtually full time to the administration of this settlement. Additionally, this firm devoted 568.75 hours to pre-settlement activities. This time was spent predominantly in areas previously described as Categories A and C. Of this pre-settlement time, 459.75 hours were worked by senior members of the firm while 109 hours were spent by junior members of the firm.

Additional time was spent by attorney Walter E. Riordan. As with the Carroll Cronan firm, the majority of Mr. Riordan's time was spent on settlement administration. Mr. Riordan reports in his affidavit that 1,290 hours were spent in settlement administration and that 330 hours were spent by him prior to settlement administration.

The attorneys for the class jointly estimate that from 500 to 750 additional hours will be required to complete the administration of the settlement and the final disposition of this case.

## B.  REASONABLE HOURLY RATE

With respect to the Johnson Thompson firm, the Court assigns a reasonable hourly rate of $100 per hour to the efforts of Richard W. Johnson, Roger A. Johnson, and the other senior members of the firm and $40 per hour to the other firm members. Messrs. Johnson and Johnson are both well respected lawyers in this community and within the legal profession and their firm has brought to this action an extensive background and a high degree of expertise in the anti-trust field. The Court's knowledge and familiarity with the stature, legal competence and ability of these attorneys has been strengthened and reinforced in working with them throughout these proceedings. Additionally, the Court has taken into consideration the large responsibility that these lawyers have undertaken to their clients and to the non-present members of the class.

In assigning a reasonable hourly rate to the Carroll, Cronan, Roth & Austin firm and to Walter E. Riordan, the Court has likewise considered their excellent reputations and the Court's personal familiarity with their standing and abilities as members of the trial bar in this district. Therefore, the Court has assigned an hourly rate of $100 to Walter E. Riordan and to the senior members of the Carroll Cronan Firm. The Court assigns a reasonable rate of $40 per hour for the work performed by junior members of the Carroll Cronan firm on pre-settlement time. The work performed by the junior members of the Carroll Cronan firm in administration of the settlement was done wholly or predominately by John A. Doyle, whose full-time efforts to the task of settlement administration and the expertise and dedication exemplified in the work performed prompts the Court to assign a reasonable hourly rate of $70 per hour to the time devoted to settlement administration by Mr. Doyle.

In applying these reasonable hourly rates for the hours spent by counsel, the Court finds that the "market value" of the attorneys' services is as follows:

Johnson, Thompson, Klaverkamp & James

| Category | All Senior Attorneys | Others | Total |
|----------|---------------------|--------|-------|
| A | $153,500.00 | $1,680.00 | $155,180.00 |
| B | 48,460.00 | 64.00 | 48,524.00 |
| C | 207,120.00 | 7,460.00 | 214,580.00 |
| D | 25,790.00 | 7,892.00 | 33,682.00 |
| E | 55,270.00 | 3,388.00 | 58,658.00 |
| F | 57,170.00 | 44.00 | 57,214.00 |
| G | 1,140.00 | 4.00 | 1,140.00 |

**Carroll, Cronan, Roth & Austin**

| | | | |
|---|---|---|---|
| A&C | $ 45,975.00 | $ 4,360.00 | $ 50,335.00 |
| F | 45,200.00 | 113,312.50 | 158,512.50 |

**Walter E. Riordan**

| | |
|---|---|
| A&C | 33,000.00 |
| F | 129,000.00 |

Having determined the market value of the services rendered, the Court is charged with the subjective evaluation of the actual performance of counsel by examining the contingent nature of success and quality of the attorneys' work.

## C. CONTINGENT NATURE OF SUCCESS

There can be little question that the risk undertaken by plaintiffs in this action was great. Counsel undertook the litigation strictly on a contingent basis with no anticipation of recovery of any fee for their time and efforts absent success. The odds faced by counsel were enormous. Although there had been prior Congressional, Federal Trade Commission and criminal proceedings involving broad spectrum antibiotic products, none of these proceedings or the documentary evidence or testimony therein involved broad spectrum antibiotic products for non-human use. In addition, in the criminal case, the defendants were acquitted. Hence, not only did these plaintiffs not benefit from a prior government decree, they received little assistance from the evidence generated in those prior proceedings in establishing their agriculture claims. Added to this burden, was the hurdle of establishing damages over defendants' contentions (supported by prior judicial pronouncements in this litigation) that these wholesaler plaintiffs had suffered no damage, even assuming liability, since any consequent overcharges were simply "passed on" to the wholesalers' customers. In the face of these obstacles plaintiffs commenced this action on behalf of themselves and all others similarly situated. Their attorneys devoted approximately 6,000 hours in the prosecuting of this action up through the negotiation and approval of the settlement. Absent the favorable settlement ultimately reached, all of this time and effort would have gone without any compensation at all.

The expenditure of this amount of time by a financially productive attorney has to pose a serious financial burden on his law firm. These lawyers, who frequently were devoting full time to this litigation, had to ignore other business in their offices and spend many hours, weeks and months away from the management of their law offices.

Under these circumstances this Court believes that the risk posed by the contingent nature of this action was great and deserves substantial consideration in the award of a reasonable fee in this case.

## D. THE QUALITY OF THE WORK PERFORMED

The work performed by these attorneys throughout this litigation has been consistently excellent. This Court has been assigned to this case since it was filed and has ruled on virtually all matters raised in this action. In each instance counsel have been exceedingly well prepared and have advanced the interests of their clients and the unrepresented members of the class in a manner consistent with the highest standards of legal advocacy.

In addition to vigorously pursuing the elements of the litigation which is unique to this action, these attorneys have taken a major role in advancing the elements of this litigation which were common to all plaintiffs. Their work performed in this coordinated litigation on behalf of all plaintiffs not only demonstrates their dedication, but also evidences their status with other counsel and the confidence that their colleagues had in their talents and in the quality of the work they performed. One or more of the previously named attorneys attended all of the pretrial conferences held in these cases and it was evident to this Court that they were well prepared on all occasions and contributed to the

advocacy of plaintiffs' positions throughout the litigation.

Counsel in this case were actively engaged in the efforts of the "Farm Committee of Counsel" and the "Plaintiffs' National Steering Committee" since their respective inceptions. They served on various committees and subcommittees of these coordinating bodies in addition to serving as secretary and, at times, acting chairman. This Court is aware that these attorneys have spent hundreds of tedious hours working on the common discovery aspects of this litigation including frequent negotiations with defense counsel and the examination and review of the massive documentary evidence produced in this litigation.

These attorneys also prepared many of the legal briefs and memoranda submitted to this Court on behalf of all plaintiffs and most of the briefs submitted to the Second and Eighth Circuit Courts of Appeal and the Supreme Court of the United States in connection with the numerous appellant writs sought in these cases. The continuous assignment of these extremely important matters to these particular lawyers exemplifies the confidence shown by all plaintiffs' counsel in their ability to perform the work undertaken by them. While this Court is not privy to all of those factors which motivated the settlement in this case, it is reasonable to assume that this, the first of the settlements in these litigating cases, was prompted in some degree by the experience, dedication and quality of work of plaintiffs' counsel.

Similarly, the work performed by counsel in negotiating, submitting for approval and administering the settlement was always excellent and consistent with the trust imposed upon them for the benefit of all members of the class. The nature of the work performed by counsel in administering the settlement was probably best described by the Court's Special Master, David Lebedoff, when, at the hearing of May 2, 1975, he stated

The members of the class involved are only served in matters of this sort when the counsel apply themselves to the administration and distribution of the fund with the same energy and the same diligence that was applied to the litigation in the first place and if that isn't done, I think justice isn't done.

So as a representative of the Court, working with counsel on this matter, I am very pleased to say that diligence was also evidenced by each of the attorneys who worked the many hours, many creative hours, in seeing to it that myriad details were resolved equitably and that the fund was returned as fairly as possible to those to whom it ought to be returned.

And it has been for me a rewarding experience to observe the diligency and the expertise and unfailing commitment of the attorneys in this matter . . . .

In examining the risk undertaken and the quality of the work performed the Court finds the following factors should be utilized as a multiplier to the market value of the services rendered as set forth above:

Category A—2.5
Category B—2.0
Category C—2.5
Category D—2.0
Category E—2.0
Category F—1.0
Category G—1.0

In arriving at these factors the Court recognizes that the hours worked on settlement administration were done with the knowledge that some compensation would be rendered. Hence, there is no risk factor added to those hours and, although the Court finds that the quality of work was excellent in the administration of the settlement, the work was performed in a non-adversary setting and was largely administrative. Hence it is felt that the reasonable hourly rate previously assigned is sufficient compensa-

tion for the work performed in settlement administration.

The application of these factors to the previously determined market value of the services rendered results in reasonable attorney's fees for each category as follows:.

| Categories | Reasonable Fees for Services Rendered |
|---|---|
| A & C | $1,132,737.50 |
| B, D & E | 281,728.00 |
| F & G | 345,866.50 |
| TOTAL | $1,760,322.00 |

■ In light of the fact that plaintiffs' petition for fees, adopted some two years ago and reaffirmed at the recent hearing, is less than the amount this Court finds reasonable under the applicable judicial criteria, the Court finds that the fees requested by plaintiff in the amount of $1,500,000.00 are fair and reasonable to the class and to the attorneys.

In awarding fees, the Court must also consider the fees received and to be received in other actions, the amount to be received from retained clients, and any amounts previously paid. Counsel in this case have allocated their time between this case and the other cases in this litigation on which they are working. Therefore the time upon which their request is based and upon which the Court has made its findings above has not been and will not be utilized in computing fees in any other action. Hence, no adjustment is required on that account. Similarly, to insure that their retained clients were treated the same as all class members, counsel have waived all fee arrangements and, therefore, no adjustment need be made on that basis. Counsel have, however, previously been awarded $750,000. as an advance against fees in this case and, therefore, the Court deducts that amount from the total award of $1,500,000 and awards, herein, the sum of $750,000.

## V.

## COSTS AND EXPENSES

■ Plaintiffs' counsel in their petition for fees and costs also requests reimbursement for their out-of-pocket costs and expenses in the amount of $43,922.72. These are more fully described in their petition and the accompanying affidavits. Additionally, certain named plaintiffs have petitioned for their costs and expenses and for reimbursement for time spent away from their businesses and devoted to the prosecution of this litigation. The time spent by these plaintiffs includes conferences with counsel, attendance at depositions taken by defendants and retrieval of documents requested by counsel for work on a damage estimate. The Court has reviewed these requests and finds that they are reasonable and that they were directly related and necessary to the prosecution and settlement of this action.

The basis for reimbursing plaintiffs and their counsel for costs and expenses is similar to that which dictates the payment of attorneys' fees.

Indeed, if those plaintiffs who are now seeking reimbursement for their litigating expenses had not been willing to undertake the risk of incurring these substantial expenses, the non-litigating claimants might not today be recovering the sums to be distributed to them. The equitable rule against saddling the active representatives of a class with the entire expense of legal effort, of benefit to all, should not be applied in a narrow or technical manner. *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 341 F.Supp. at 1084.

The absent class members who were silent participants in this litigation and who, in many cases are receiving more from this litigation than the named plaintiffs, should be grateful to those initiating plaintiffs who assumed the risk of this case for the benefit of all. The Court believes that it is certainly a small but just compensation to those initial plaintiffs to return to them their costs and expenses and to compensate them for their time devoted to the prosecution of this litigation. The Court therefore finds the petition of Midwest Veterinary

Supply, Inc. in the amount of $1,840.; the petition of S. Pogoriler, assignee of Farm Vet Supply, Inc. in the amount of $710.; and the petition of Veterinary Specialties, Inc. in the amount of $428. are fair and reasonable and reflect expenses and time necessary to the prosecution and settlement of this action. The Court further finds that the petition of counsel for reimbursement of their costs and expenses in the amount of $43,922.72 is fair and reasonable and reflects expenses actually and necessarily incurred in the prosecution and settlement of this action.

## VI.

### FEES OF THE SPECIAL MASTER

Special Master David Lebedoff has submitted his statement for services rendered in connection with this settlement and counsel for the class have strongly urged its approval. Mr. Lebedoff seeks $20,906.25 for 278.75 hours devoted to this case. This represents an hourly rate of $75.

It is insufficient to simply pass on this request without expressing this Court's appreciation and commendation for the services performed by Mr. Lebedoff and Mr. Thomas Bartsh. While Mr. Bartsh worked on this case as part of his duties as Special Master for all the antibiotics cases he will not be compensated from this settlement fund. These men have been of invaluable assistance to this Court in its judicial administration of this settlement. They have worked long and hard with counsel and the Court in judiciously considering the claims submitted and in devising fair and just procedures for the handling of claims and the distribution of the settlement fund. There have been no appeals or objections to this Court from any of the rulings or recommendations made by them. Dedication to the fair and just treatment of all class members coupled with the innovative assistance in the establishment of successful techniques for the management of this class action has rendered their services worthy of the gratitude of this Court and counsel. The Court therefore adopts the recommendation of counsel and approves the payment of $20,906.25 to Mr. Lebedoff.

## VII.

### FUTURE COSTS AND EXPENSES

Counsel have requested that $20,000. be set aside from the distribution of the settlement fund to cover the final costs and expenses of settlement distribution and the costs and expenses relating to the conclusion of this action, and for such currently unforeseen contingencies as may arise. The Court finds that this request is reasonable and is therefore approved. The sum of $20,000. will be withheld at the time of distribution pursuant to this Order pending further order of the Court.

### CONCLUSION

Consistent with the foregoing findings and for the reasons herein set forth,

It is hereby ordered that:

1. Following the applicable appeal period and consistent with the expiration of the certificates of deposit of the settlement fund, the Clerk of Court, with the advice and assistance of counsel for plaintiffs, shall distribute the settlement fund as follows:

a. $793,922.72 to Richard W. Johnson.

b. $20,906.25 to David Lebedoff.

c. $20,000 shall be retained under the control of the Clerk of District Court and at his discretion, deposited with an appropriate financial institution in an interest bearing account pursuant to applicable statutes, rules and regulations.

d. The remainder of the fund shall be distributed to each claimant whose claim is hereby approved pursuant to the plan of distribution hereby approved and adopted.

2. Within thirty (30) days following the distribution of the settlement fund, as herein ordered, counsel for plaintiffs

with the advice and assistance of the Clerk of District Court, shall file a report with this Court which report shall describe the distribution of the settlement fund, provide an accounting of the settlement proceeds, and contain recommendations to this Court for distribution of any remaining funds and any other matters required for the final termination of this action.