In re COORDINATED PRETRIAL PROCEEDINGS IN ANTIBIOTIC ANTITRUST ACTIONS.* 4–71 Civ. 435.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 11, 1974.

---

* Consolidated with:

Doughboy Industries, Inc., 4–68 Civ. 409; Dr. E. J. Hoffert, 4–69 Civ. 458; Anderson Cattle Co., Inc., 4–71 Civ. 421; Burgess Poultry Market, Inc., 4–71 Civ. 426; Marshall Durbin Food Corp., 4–71 Civ. 433; Jack England, 4–71 Civ. 430; Bernard Kay, 4–71 Civ. 425; Kenneth Murray Co., 4–71 Civ. 434; Missouri Farmers Association, Inc., 4–71 Civ. 424; A. C. Smith Poultry Co., 4–71 Civ. 428; Balfour, Guthrie & Co., Ltd., 4–71 Civ. 429; Carl F. Dodge, 4–71 Civ. 427; Edwards Brothers Milling Co., Inc., 4–71 Civ. 423; Grange Co., 4–68 Civ. 411; Louisiana Hatcheries, Inc., 4–71 Civ. 422; Minnesota Fur Foods Cooperative, 4–68 Civ. 410; Rutledge Ranch, 4–71 Civ. 432; Guy J. Phelps, Jr., 4–71 Civ. 431; State of Kansas, 4–71 Civ. 400; State of Oregon, 4–71 Civ. 392; State of Washington, 4–71 Civ. 395 v. American Cyanamid Company.

See also, D.C., 410 F.Supp. 669.

Cochrane & Bresnahan, St. Paul, Minn., Chestnut, Brooks & Burkard, Minneapolis, Minn., Hollabaugh & Jacobs, Washington, D. C., Hamrick & Hamrick, Rutherfordton, N. C., James F. Graham, Zanesville, Ohio, Granger & Nagels, Overland Park, Kan., Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., Shea, Gould, Climenko & Kramer, New York City,

Slade Gorton, Atty. Gen., of the State of Washington, by Ferguson & Burdell, Seattle, Wash., Lee Johnson, Atty. Gen., of the State of Oregon, Salem, Ore., Curt T. Schneider, Atty. Gen., of Kansas by Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., H. Derrell Dickens, El Dorado, Ark., for Doughboy Class Committee of Counsel.

Cochrane & Bresnahan, St. Paul, Minn., Chestnut, Brooks & Burkard, Minneapolis, Minn., Shea, Gould, Climenko & Kramer, New York City, Slade Gorton, Atty. Gen., of the State of Washington, by Ferguson & Burdell, Seattle, Wash., Lee Johnson, Atty. Gen., of the State of Oregon, Salem, Ore., Curt T. Schneider, Atty. Gen., of the State of Kansas, by Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., for Hoffert Class Committee of Counsel.

Cochrane & Bresnahan, St. Paul, Minn., for plaintiffs in Doughboy Industries, Inc., et al., The Grange Company, et al., Minnesota Fur Foods Cooperative, et al., and E. J. Hoffert, et al.

Chestnut, Brooks & Burkard, Minneapolis, Minn., for plaintiffs in Doughboy Industries, Inc., et al., The Grange Company, et al., Minnesota Fur Foods Cooperative, et al., and E. J. Hoffert, et al.

Hollabaugh & Jacobs, Washington, D. C., for plaintiffs in Burgess Poultry Market, Inc., et al.

Hamrick & Hamrick, Rutherfordton, N. C., for plaintiffs in Edwards Brothers Milling Co.

Brown, Compton & Prewett, El Dorado, Ark., for plaintiffs in A. C. Smith Poultry Co., et al., Jack England, et al., Louisiana Hatcheries, Inc., et al., and Marshall Durbin Food Corp., et al.

Granger & Nagels, Overland Park, Kan., for plaintiffs in The Anderson Cattle Co., Inc., and Missouri Farmers Ass'n., Inc., et al.

Shea, Gould, Climenko & Kramer, New York City, for plaintiffs in Kenneth Murray Co., Guy J. Phelps, Jr., and Rutledge Ranch.

Law Offices of Joseph L. Alioto, San Francisco, Cal., for plaintiffs in Balfour, Guthrie & Co., Ltd.

James F. Graham, Zanesville, Ohio, for plaintiffs in Bernard Kay, et al.

Lee A. Freeman, Chicago, Ill., for plaintiffs in Carl F. Dodge, et al.

Slade Gorton, Atty. Gen., of the State of Washington, by Ferguson & Burdell, Seattle, Wash., for State of Washington.

Lee Johnson, Atty. Gen., of the State of Oregon, Salem, Ore., for State of Oregon.

Curt T. Schneider, Atty. Gen., of the State of Kansas, by Crane, Martin, Claussen, Hamilton & Barry, Topeka, Kan., for State of Kansas.

H. Derrell Dickens, El Dorado, Ark., for plaintiffs in A. C. Smith Poultry Co., et al., Jack England, et al., Louisiana Hatcheries, Inc., et al., and Marshall Durbin Food Corporation, et al.

Donovan, Leisure, Newton & Irvine, New York City, and Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for American Cyanamid Company.

Gibson, Dunn & Crutcher, Los Angeles, Cal., Maun, Hazel, Green, Hazel, Simon & Aretz, St. Paul, Minn., and Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Pfizer Inc.

Winthrop, Stimson, Putnam & Roberts, New York City, and Faegre & Benson, Minneapolis, Minn., for Bristol-Myers Company.

Cravath, Swaine & Moore, New York City, and Faegre & Benson, Minneapolis, Minn., for Squibb Corporation and Olin Corporation.

Covington & Burling, Washington, D. C., and Faegre & Benson, Minneapolis, Minn., for The Upjohn Company.

## MEMORANDUM OPINION APPROVING SETTLEMENT

MILES W. LORD, District Judge.

The parties to these class actions have moved the Court pursuant to Rule 23(e)

of the Federal Rules of Civil Procedure for approval of a proposed settlement of this action.

## I. BACKGROUND.

The *Doughboy* and *Hoffert* class actions and related actions are a part of the more than 150 related Broad Spectrum Antibiotics (hereafter BSA) actions which were transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation for coordinated pretrial proceedings under 28 U.S.C. § 1407. *In re Antibiotic Drug Litigation,* 295 F.Supp. 1402 (Jud.Pan. Mult.Lit.1968). See also J.P.M.L. Order of April 3, 1969. The Panel noted that all of these actions are to some degree related to the 1958 Federal Trade Commission proceedings and to the 1961 criminal antitrust prosecution which resulted in a conviction later reversed.[1]

The consolidated BSA actions all involve certain common elements. In each case, a combination or conspiracy to restrain trade in and to monopolize the BSA market is charged. It is alleged that these antitrust violations stem from the fraudulent procurement of the tetracycline patent and certain interference settlement and licensing agreements among and between the defendants which made it possible for them to market BSA products while excluding other competitors or potential competitors from the market.

Since 1968–69, counsel for the parties have been engaged in a program of coordinated pretrial discovery together with other plaintiffs whose actions were transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation for consolidated and coordinated pretrial discovery. *In re Broad Spectrum Antibiotics Drugs* (Docket 10–J.P.M.L.). Throughout these proceedings, plaintiffs' counsel have operated through a National Steering Committee composed of members representing various groups of plaintiffs including a farm committee. These committees were established pursuant to Pretrial Order No. 1 dated February 24, 1970; that order was issued by Judge Inzer B. Wyatt, to whom the Multidistrict Panel originally had assigned these cases. On May 26, 1969, Judge Wyatt was requested to rule upon and administer a settlement covering 43 states and certain other classes; and with Judge Wyatt's consent and recommendation, the Panel on December 2, 1970, assigned actions continuing in a litigating status to this Judge, under special assignment to the Southern District of New York.[2] Subsequently, these actions were transferred under 28 U.S.C. § 1404(a) to the District of Minnesota.[3] Pretrial Order No. 1 (with slight modifications) remained in effect.

By Class Action Order 71–2 of January 15, 1971, *E. J. Hoffert, et al. v. American Cyanamid Company, et al.,* was approved by this Court as a national class action on behalf of veterinarians who purchased broad spectrum antibiotics for non-human use. By Class Action Order 71–3 of January 21, 1971, this Court had determined that *Doughboy Industries, Inc., et al. v. American Cyanamid Company, et al.,* should proceed as a national class action on behalf of purchasers of broad spectrum antibiotics for feed mixing and purchaser-use purposes. The approval of these classes followed more than two years of pretrial discovery by the parties and the recommendation of plaintiffs' counsel for the creation of a single national class in each category.

After recognition of the classes, 17,790 mail notices, directed to members or potential members of the class, were sent in the *Doughboy* action and 26,819 mail notices were sent in *Hoffert.* In addition, notice of the *Doughboy* class forma-

---

1. The defendants later were acquitted on all counts following retrial of the criminal action. *U. S. v. Chas. Pfizer & Co., Inc.,* 367 F.Supp. 91 (S.D.N.Y.1973).

2. *In re Antibiotic Drugs Antitrust Litigation,* 320 F.Supp. 586 (Jud.Pan.Mult.Lit.1970).

3. *In re Antibiotic Drugs Antitrust Litigation,* 333 F.Supp. 309 (S.D.N.Y.1971).

tion was published in eleven farm periodicals. Both class notices were of the opt-out type and both provided for intervention and representation through a prospective class member's own attorney, if desired.

There were 19 pending actions filed in 14 different jurisdictions on behalf of potential members of the class at the time Class Action Order 71–3 was signed. Three of these actions were filed by States' Attorneys General in Kansas, Oregon and Washington on behalf of farm users and State purchasing institutions in their respective jurisdictions. Contemporaneously with the recognition of the classes, plaintiffs in three of these actions withdrew their Rule 23 Motions for Class Determination and one of these actions subsequently was dismissed.[4]

Class Action Order 71–3 designated a Committee of Counsel comprised of counsel of record in the 19 captioned actions to represent the class. As the litigation progressed, certain originally designated counsel were unable to participate to the requisite degree in coordinated pretrial activities and, after notice and opportunity for hearing, were relieved of further responsibility as class counsel. The Court finds that the 11 firms remaining on the *Doughboy* Class Committee of Counsel and their associated firms have provided broad national representation of broad spectrum antibiotic farm purchasers.

The *Hoffert* Committee of Counsel created by Class Action Order 71–2 is comprised of counsel for the five captioned actions covered by that order. This list of counsel includes representation by the Attorneys General of Kansas, Oregon and Washington on behalf of veterinary purchasers of BSA in their respective jurisdictions.

## II. THE SETTLEMENT.

The terms and conditions of the settlement are set forth in the parties' memorandum of agreement dated September 20, 1973. In essence, the settlement calls for the payment of thirty-five million dollars plus an amount equal to one years interest at the rate of 9% per annum for the full and final settlement of all claims arising under the *Doughboy* and *Hoffert* class actions and related actions. The agreement also encompasses those individuals who purchased BSA for resale at retail for non-human use, thus expanding the original *Doughboy* class definition. While making the settlement offer, the defendants deny any liability, and the Court makes no finding thereof.

## III. NOTICE OF SETTLEMENT.

After examining the proposal, the Court directed notice to the classes stating the terms of the proposal and setting a date for a hearing with respect to its fairness and adequacy; 17,263 mail notices were sent in the *Doughboy* action and 27,253 mail notices were sent in the *Hoffert* action. Notice in the *Doughboy* action was again published in the same eleven farm periodicals. In addition, the *Doughboy* notice was mailed to 32,708 farm retailers. The hearing was conducted on December 28, 1973, and no opposition to the settlement was expressed.

## IV. CRITERIA FOR APPROVING SETTLEMENTS IN CLASS ACTIONS.

The legal standards to be considered in determining whether a proposed settlement of a class action should be approved are discussed in *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740–44 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir. 1971), *cert. denied sub nom., Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *See also, In re Brown Company Securities Litigation*, 58 F.R.D. 19, 36–71 (W.D.Okl.1972); *Feder v. Harrington*, 58 F.R.D. 171, 174–77 (S.D.N.Y.1972), and *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971), aff'd, 322 F.Supp. 834 (E.D.Pa.1971). Whether a class action settlement is fair, adequate and reasona-

---

4. *Sylvan Acres, Inc. v. Chas. Pfizer & Co., Inc.*, 70 Civ. 477.

ble is within the Court's discretion. Although there is a public policy encouraging settlement of legal disputes, the court supervising a class action has the responsibility to protect members of the class who are not before the Court from a collusive or improvident settlement. The Court, however, is generally reluctant to substitute its judgment for that of competent counsel, experienced in complex antitrust litigation such as this, who have arrived at a settlement only after arm's length negotiations.

■ In evaluating the propriety of this proposed settlement, the Court has considered the potential expenses of further litigation; the plaintiffs' likelihood of success on the merits balanced against the amount offered in settlement; the experience of counsel; and the extent of support for the settlement from class members. The Court finds that upon consideration of all relevant factors the proposed settlement of this class action is fair, adequate and reasonable.

### A. POTENTIAL EXPENSES OF FURTHER LITIGATION.

Although the Court has ordered discovery to proceed on all fronts, simultaneously, the "human-consumption" cases were given trial priority. Since that time the bulk of the human consumption cases have reached a settlement agreement that is before this Court for consideration. The balance of the antibiotic cases will be scheduled for trial within the year. It is anticipated that with cooperation of all counsel these cases will still take up to three months to try. Appeals would seem likely regardless of the outcome. Thus, even if the plaintiffs were to prevail at the trial and subsequent appeals, there is no question that their expenses would be substantially increased with no guarantee of a larger reward. With the acceptance of the settlement the members of the class are receiving a very substantial recovery now, without bearing the risk and expense of further litigation. *Ladd v. Brickley,* 158 F.2d 212 (1st Cir. 1946), *cert. den.,* 330 U.S. 819, 67 S.Ct. 675, 91

L.Ed. 1271 (1947); *Neuwirth v. Allen,* 338 F.2d 2 (2d Cir. 1964); *Upson v. Otis,* 155 F.2d 606 (2d Cir. 1946).

### B. LIKELIHOOD OF PLAINTIFFS' SUCCESS.

Plaintiffs allege that beginning in November of 1953, or earlier, defendants conspired to and did monopolize the manufacture, sale and distribution of BSA and conspired to restrain trade in the manufacture, sale and distribution of BSA, within interstate and foreign commerce.

Broad Spectrum Antibiotics are antibiotics which are effective against a wide range of harmful micro-organisms, including gram positive and gram negative patheogenic micro-organisms, rickettsiae, viruses, spirochetes and protozoa. The first BSA encompassed within the definitions in the complaints herein was chlortetracycline, introduced in December of 1948, by American Cyanamid under the trade name Aureomycin. In March of 1950, Pfizer's oxytetracycline was introduced under the trade name Terramycin. In 1953, Cyanamid introduced its first tetracycline product line under the trade name Achromycin, which was followed by Pfizer's Tetracyn in January of 1954, Bristol's Polycycline in April of 1954, Squibb's Steclin in September of 1954 and Upjohn's Panmycin in October of 1954. All of these product lines, except for Aureomycin and Terramycin, are tetracycline formulations. Cyanamid owns the patent for chlortetracycline (Duggar Patent No. 2,482,055) which was issued on September 14, 1949, and an improvement patent (Niedercorn No. 2,609,329) issued September 2, 1952. Cyanamid also owns patents relating to the use of BSA in animal feeds including the Jukes (No. 2,619,420) and Harvey (No. 3,185,-573) patents. Pfizer owns the patent on oxytetracycline (Sobin No. 2,516,080) issued July 18, 1950. On January 11, 1955, Pfizer, as assignee of the Conover application, received U.S. Patent No. 2,699,-054 on tetracycline.

Shortly after the introduction of chlortetracycline and oxytetracycline, these

products were utilized as an additive or supplement to animal or poultry feed products. They were recommended for two important purposes: first, as a growth stimulant, and second, for disease prevention. Animal feed products originally were obtained by use of the mash or residue remaining after the harvest of BSA utilized in the formulation of human use products. In addition to feed use, BSA formulated from chlortetracycline and oxytetracycline were utilized as ethical or proprietary preparations for animal and poultry use in the treatment or prevention of disease. More purified forms of BSA were utilized in the formulation of animal health products prescribed and/or administered by veterinarians.

After the introduction of tetracycline in the human use market, Pfizer, Cyanamid, Bristol and perhaps Squibb experimented with the use of tetracycline for animal feed supplement purposes, similar to the use being made of chlortetracycline and oxytetracycline. Although tetracycline products for non-human use were formulated and sold in the veterinarian market and to an extent in the animal health care proprietary market, tetracycline was never widely utilized as an animal feed supplement and was not promoted for this purpose by any of the defendant companies.

During the time period covered by the farm use complaints [5] each of the defendant companies marketed a line of BSA products in the animal health or veterinary field. The prices charged for veterinary preparations were closely related to the prices charged for BSA in human dosage form. Veterinary products were not made from the same type of mash or residue as were the various feed supplement preparations.

The defendants' and the plaintiffs' estimate of the total size of the BSA market (feed and animal health products)

correlate quite closely with respect to given years and total figures. The parties are agreed that sales for the period 1954–66 are in excess of $400,000,000, and more than $600,000,000 for the period 1954–70.

The Court has had available to it extensive economic data, including that filed in support of the *Doughboy* and *Hoffert* class action motions. The Court has also had available the answers to interrogatories dealing with the economic aspects of the case and including the farm market, filed by both plaintiffs and defendants.

The Court has also examined and relied upon the extensive economic and market information included in plaintiffs' Memorandum In Support of Proposed Class Action Settlements in Doughboy and Hoffert Actions. The Court is aware that this data is the product of three agricultural economists who have been retained for some years by the farm committee.

After consideration of all of this material, the Court feels that plaintiffs' chances of establishing liability are tempered by:

a. Certain recent developments in Government actions relating to BSA.

b. Differences between defendants' marketing policies for human and non-human use products.

c. Defendants' policies not to market tetracycline for feed supplement purposes.

This is not to denigrate plaintiffs' chances of ultimate recovery but to recognize, as did plaintiffs' counsel during the course of the settlement negotiations, that any recovery resulting from litigation would present some difficulties and would carry the risk of further litigation in the event defendants successfully pursued certain appeals.

5. Although these complaints alleged the same approximate time span for damage computation purposes there were minor variations. During pretrial discovery, however, all farm plaintiffs indicated that they had reached a common position with respect to the damage time frame, and that they would move to amend their pleadings in this and other respects at a time designated by the Court.

Recent developments in government actions include the acquittal of Pfizer, Cyanamid, and Bristol on criminal counts similar to those which plaintiffs have alleged constituted acts in furtherance of the combination and conspiracy. The effect of this acquittal, however, is somewhat lessened by plaintiffs' disavowal during the course of the pretrial proceedings of an intent to rest their liability case merely on the prima facie effect of the criminal conviction. Moreover, the burden of proof in civil antitrust damage actions is substantially less than the "beyond a reasonable doubt" standard borne by the government in its criminal action. Finally, the plaintiffs have been coordinating with the government in its civil antitrust action which is in the final stages of pretrial preparation. The Court notes that the government and other plaintiffs have stated an intention to utilize evidence obtained during the course of the consolidated pretrial proceedings. By virtue of plaintiffs' discovery, and rulings by Judge Wyatt and this Judge, the potential evidence in these civil actions goes substantially beyond the evidence presented by the government in support of the 1961 criminal indictment.

Although the Court finds that plaintiffs' chances of establishing liability are far from negligible, there remains the question of proving damages in amounts which would greatly exceed the settlement fund.[6] The settlement fund constitutes very substantial recovery in absolute dollar terms and when measured against defendants' overall sales. Defendants have maintained that price declines on their BSA farm products lines tend to minimize damages which could be recovered even on a showing of liability. Although plaintiffs may argue that a reduction in unit prices may be offset by reduced costs so that damages are not necessarily lessened, the Court finds that the settlement fund is reasonable and fairly related to the overall amount of purchases in the farm area and to the pricing schedules in effect during the period covered by the farm complaints.

In assessing the adequacy and fairness of the settlement agreement the Court has attempted to "apprise himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Committee v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1967). "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation" *Id.* at 424–25, 88 S.Ct. at 1163. The Court has proceeded in this fashion in reaching its conclusions with respect to the fairness of this settlement. Five years of discovery in the farm action has provided the parties and the Court a substantial factual and economic base upon which to judge the adequacy of settlement. *Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp.,* 323 F.Supp. 364 (E.D.Pa.1970).

The Court has taken into account the probabilities of success of plaintiffs following trial compared with the risk and cost of further litigation. *Neuwirth v. Allen supra; Upson v. Otis supra.* At the same time, we have recognized the impossibility of guessing the final outcome of full litigation involving these claims. *In re Riggi Bros. Co., Inc.,* 42 F.2d 174, 176 (2d Cir. 1930); *Schleiff v. Chesapeake and Ohio Ry.,* 43 F.R.D. 175, 179 (S.D.N.Y.1967). The final outcome of these actions rests not only upon the class members' ability to prove the antitrust violations alleged, but their ability to establish the fact and extent of damage to the class. Moreover, we must

---

**6.** In assessing the probability of establishing liability, the Court is not unaware that three Special Masters appointed to consider claims relating to loss of privilege through fraudulent or illegal conduct, ruled that plaintiffs had established a prima facie case, at least against some defendants. This finding was not disturbed by the Court of Appeals for the Eighth Circuit following a mandamus petition filed by defendants. *Chas. Pfizer & Co., Inc. v. Lord,* 456 F.2d 545 (8th Cir. 1972), *Bristol-Myers Co. v. Lord* (8th Cir. 1973).

consider the defendants' denials of any violation coupled with their insistence that even should liability be conceded damages would be minimal.

The Court has already commented upon the advantages to the class of accepting a compromise at this time which will result in a more immediate monetary recovery than waiting for a period of perhaps years in an attempt to recover even greater damages. *Ladd v. Brickley, supra.*

## C. *EXPERIENCE OF COUNSEL.*

Information with respect to the progress of the negotiations relating to this settlement proposal is obtained from affidavits filed by Messrs. John A. Cochrane, Jack L. Chestnut and Douglas V. Rigler, attached as appendices to the plaintiffs' "Memorandum In Support of Proposed Class Action Settlements in Doughboy and Hoffert Cases," dated December 28, 1973, and Messrs. Samuel W. Murphy, Jr. and Philip M. Hammett, attached as appendices to "Defendants' Memorandum in Support of Proposed Settlement" dated December 21, 1973. The record indicates that the first settlement offer of the defendants was in the area of $200,000. Since that time, of course, substantial discovery by both sides has taken place. By preparing for trial and through skillful and competent pursuit of an adequate remedy, the Farm Committee has been able to obtain this settlement of thirty-five million dollars.

The recommendation of experienced antitrust counsel is entitled to great weight. *Schleiff v. Chesapeake and Ohio Ry. Co., supra.* See also, *Glicken v. Bradford,* 35 F.R.D. 144 (S.D.N.Y. 1964). We have observed these counsel for more than three years during the conduct of these actions. Every member of the farm committee is not only an experienced antitrust lawyer, but a respected member of the bar. This Court feels that they are very knowledgeable and competent people and relies a great deal upon their recommendation.

The Court finds that the negotiators for the parties acted independently and in pursuit of the best interests of their respective clients throughout the length and vigorous course of the negotiations. All of the negotiations were conducted at arms length and against a background of actual trial preparation.

## D. *EXTENT OF SUPPORT BY MEMBERS OF THE CLASS FOR THE SETTLEMENT.*

As related above, this Court independently examined the terms and conditions of the agreement and thereafter directed mail and publication notices to the class, including farm retailers, as to the terms and conditions of the agreement. Pursuant to the October 3, 1973 notice, a settlement hearing was held on December 28, 1973. At that hearing, no opposition, written or oral, was expressed by any member or potential member of the classes. The settlement was endorsed by the Attorneys General of all six states whose actions are now consolidated before this Court.

## V. MANAGEABILITY.

The settlement herein approved will apply to classes with membership numbering in the tens of thousands. The monetary distribution to class members will be in the tens of millions. For both original class recognition purposes and for settlement administration purposes, the manageability of these actions has been an important consideration.

From the outset, it was contemplated that these actions would be tried. However, the Court has encouraged settlement, because not only would this entail a saving of judicial resources but also because there are corresponding advantages to defendant companies whose management necessarily would be involved in a lengthy trial and to the plaintiffs who will achieve a certain and earlier recovery. A point to be emphasized, however, is that the structure of these large national classes did not require different treatment, depending

upon whether these actions were to be litigated or settled.

Under the supervision of both judges who have had responsibility for the farm cases, the Court has concentrated on requiring counsel representing multiple plaintiffs to cooperate and address themselves to the issues through a committee system. The diversity of counsel in fact has paid dividends in terms of giving a more comprehensive geographic cast to the representative plaintiffs proceeding on behalf of the class. For example, the defendants, early in these proceedings, engaged in a substantial round of farm depositions in which they explored industry structure as it related to farm purchases of BSA in virtually every area of the country (e. g., North Carolina, Texas, California, Washington, Minnesota, etc.).

The Court also notes that large classes represented by a team of competent counsel ordinarily will have the ability to obtain economic expertise; that was certainly the case in these actions. In this particular instance, plaintiffs' economists consisted of one former chief economist to the Federal Trade Commission and two scholars specializing in the field of agricultural economics. Defendants, likewise, were able to rely upon expert economic advice in framing their position as to the appropriate parameters of the farm market. Throughout these cases, the Court has found it useful to have the plaintiffs' and the defendants' economists consult with an economist and statistician appointed by the Court for the purpose of coordinating economic and statistical studies. This has assisted in translating market information to a common base. Many potential problems attributable to different methods of presenting data drawn from the same base were thus avoided.

With respect to notice, the Court has found in the Broad Spectrum Antibiotic actions that when a proposed class is made up of what might be called commercial purchasers—i. e., those whose purchases are made in connection with some type of ongoing business activity—retention of purchase information is more frequent than would be the case for intermittent purchasers. Also, the principal problem of notice is solved, where there is some basic business reason for assembling lists or categories of purchasers. Often defendant companies themselves can provide substantial lists of purchasers since customer identification is a major part of their ongoing sales programs. This generalization has proved accurate not only in farm actions, but in other actions consolidated in Docket 10.

Thus, it is this Court's opinion that size alone is not and need not be a limiting or inhibiting factor in terms of manageability of classes. Where there is a means of identifying purchases no matter how numerous they may be and where there is reason to believe that records relating to these purchases are likely to be kept, class manageability should not pose an insurmountable problem. The Court makes a specific finding that the Broad Spectrum Antibiotic farm actions encompassed by this settlement at all times ssince the recognition of the classes have been manageable, both for litigating and settlement administration purposes. "Unmanageability" played no part whatsoever in the Court's approval of this settlement.

Upon the approval of this settlement, defendants will be relieved of further obligation to the classes arising out of matters alleged in these complaints. The farm committee, however, will remain active in the processing of claims under the direct supervision of this Court. The committee has already made substantial progress in placing the names of class members on computer tapes with identifying numbers to aid in claim processing. With the aid of modern computer techniques and information retrieval, the size of the class does not impose an unsolvable administrative problem.

■ Even though the Court has found the classes would be manageable in the specific context of these actions, it notes generally that class size alone should

never by used to permit wrongdoers[7] to retain the fruits of their unlawful actions. Neither the asserted complexity of the issues nor the magnitude of the claimants and the asserted damages can be allowed to preclude the fair administration of justice. A judicial system which places a higher premium on convenient administration than on redress of grievances soon ceases to be just. Moreover, from the viewpoint of judicial administration there probably is greater efficiency achieved on a "per claim" basis in a major national class action than through dealing with claims on a piecemeal basis.

## VI. CONCLUSION.

■ Taking into account all of the above considerations and the record as a whole the Court finds the settlement to be fair, adequate and proper. Although plaintiffs may feel that their chances of establishing liability are bright, recovery is not certain. Damages, even on a showing of liability, may not substantially exceed the amounts provided in the settlement fund. Any recovery resulting from litigating these actions to their conclusion is some time away. Experienced counsel representing a broad group of class members have recommended settlement. No opposition to the settlement was expressed by any class member or potential class member. The settlement negotiators had acquired very substantial industry and market data during the course of several years of pretrial discovery. Both sides had the assistance of farm economists. Bargaining was prolonged and at arms length. All of these factors convince the Court that settlement as provided herein is fair, adequate and proper and orders and judgments to this effect will be entered without delay.

**7.** This is a generality relating to manageability since the Court has already concluded that no finding of liability on the part of defendants is made in this opinion.

**\*** Consolidated with:
 State of Oregon, 4–71 Civ. 392; State of Washington, 4–71 Civ. 395; Hawaii, 4–71 Civ.