Elroy MUEHLER, Richard A. Price, Alvin Jochim, Terry Luehring, Edgar Luehring, Russell Kolberg, Don Helfter, Michael L. Huisman and Doolittle Turkey Farm, Inc., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

LAND O'LAKES, INC., a Minnesota corporation, Defendant.

No. 4–83 Civil 600.

United States District Court, D. Minnesota, Fourth Division.

Sept. 10, 1985.

Robins, Zelle, Larson & Kaplan, Stanford Robins and Brent L. Reichert, Minneapolis, Minn., Meyer, Meyer & Pottratz, Mark H. Meyer, Melrose, Minn., for plaintiffs; Letnes, Marshall, Fiedler & Clapp, Jay H. Fiedler, Grand Forks, N.D., of counsel.

Doherty, Rumble & Butler, Frank Claybourne and Thomas A. Connop, St. Paul, Minn., for defendant.

Bottorff & Van Doren, Kieth Van Doren, Webster City, Iowa, for Webster City Production Credit Assn.

## MEMORANDUM DECISION
## AND ORDER

MILES W. LORD, District Judge.

Plaintiffs' attorneys have appealed pursuant to 28 U.S.C. § 636(c)(4), and Local Rule 14 G(5)(b), from a United States Magistrate's Memorandum Decision and Order dated August 16, 1985, awarding attorneys' fees, costs and expenses in the above-entitled matter.

This action was originally commenced in the United States District Court, District of North Dakota, in April, 1982, by ten turkey growers, on behalf of themselves and others similarly situated. Prior to 1980, defendant Land O'Lakes, Inc. had purchased

turkeys outright from its cooperative members at the current market rate, and had processed and marketed the turkeys as an independent operation. For the 1980 processing season, Land O'Lakes had instituted a marketing arrangement whereby turkeys received from its grower-members were "pooled" for marketing. Under the pool arrangement, Land O'Lakes processed and marketed the turkeys, and the producers were paid a pro rata share of the proceeds received by Land O'Lakes, less administrative and marketing costs. The claim for relief is essentially based upon allegations that Land O'Lakes breached the marketing agreement with the growers that established the pool arrangement, breached a fiduciary duty owed to the growers, and violated a state statute relating to cooperative marketing agreements.

On July 11, 1983, the North Dakota District Court entered an order certifying the case as a class action to be maintained on behalf of a class composed of all turkey growers who sold turkeys to defendant and received payment through the 1980 Cooperative Marketing Pool, with the exception of growers who furnished turkeys for processing from breeder flocks, and growers who participated in a certain Land O'Lakes "contract grow-out program." The certification order also changed the venue, transferring the case to the District of Minnesota.

The parties engaged in extensive and exhaustive discovery, pre-trial proceedings, and settlement negotiations during the following two and one-half years. In December, 1984, in an attempt to avoid a protracted trial, this Court convened a "mini-trial" (a summary trial to an advisory jury). A 12 person jury was formally impaneled, and over the course of several days, counsel informally presented the case by proffer of evidence, examination and cross-examination of witnesses, and introduction of exhibits. Counsel formally presented closing arguments, the Court delivered an abbreviated charge, and the panel was split into two six-person juries to deliberate and render a verdict on special interrogatories. Plaintiffs had argued for $4,802,604.00 in damages. Most of the damage claim ($2,800,000.00) depended upon the jurors' responses to sharply conflicting opinions of expert accounting witnesses. Of the remaining request, $1,580,000.00 was subject to the risk of being denied as a matter of law prior to an actual trial.

The results of the mini-trial were ambiguous. One jury panel found no liability, which would mandate a defendant's verdict. The other panel returned a verdict for plaintiffs in the amount of $2,292,000.00. Three jurors on this panel also assessed an additional $210,000.00 as punitive damages.

Potential class member growers, accounting for 13% of the total liveweight of turkeys that had been contributed to the Pool, had opted-out of the class action. Since the verdicts in the mini-trial were based on the damages to the entire marketing pool, an adjustment would have to be made for the volume represented by the opt-outs. Adjusting for the volume represented by the opt-outs yields a potential range of net verdicts from zero to $1,994,258.00 for the class members.

Following the return of these verdicts, the Court and counsel took the opportunity to review with the jury their impressions of the case as presented in the mini-trial format. Thereafter, the case was assigned to a United States Magistrate pursuant to the provisions of Title 28 U.S.C. § 636(c), and a number of motions were filed or renewed. Both sides obviously recognized that considerable work and expense would be necessary to obtain further discovery, bolster positions, and to muster new arguments in preparation for further pre-trial proceedings and for trial. During the ensuing six months, earnest settlement negotiations were conducted. Ultimately, a settlement agreement was signed on June 18, 1985.

The proposed settlement requires defendant to pay $1,550,000.00 in full settlement of all class claims, from which will be deducted fees for attorneys for the class, litigation expenses, and interest on out-of-pocket expenses contributed by certain

members of the class to form a litigation fund. The balance of the payment will be paid to members of the class pro rata, based upon the liveweight pounds of turkeys delivered to the 1980 Pool, and subject to the right of set-off by Land O'Lakes against proceeds payable to any individual class member arising from advances made or delinquent trade accounts.

 Based upon the risk factors, a reasonable estimate of maximum recovery, the novel theories advanced by plaintiffs to support the cause of action, and other relevant factors, the Magistrate ruled that the proposed settlement and the compromise payment of $1,550,000.00 was fair, reasonable and in the best interests of all of the growers affected by the settlement and by dismissal of this action. Because no one has (1) requested a review of this portion of the Magistrate's Order and (2) because it is based upon sound rationale and reasoning, the ruling that the settlement be approved is adopted.

### ATTORNEYS' FEES

 The attorneys for the plaintiff class have requested review and modification of the Magistrate's Decision and Order awarding attorneys' fees, costs and expenses. Because the class representatives and their attorneys successfully recovered a fund for the benefit of all class members, an award of fees to counsel for the class from that fund is appropriate. *See, Boeing Co. v. Van Gemert*, 444 U.S. 472, 481–82, 100 S.Ct. 745, 750–51, 62 L.Ed.2d 676 (1980).

In support of the fee application the three law firms representing the class originally submitted a great deal of documentation to the Court including a Joint Fee Petition, supporting affidavits of the attorneys, daily time records, affidavits of the class representatives expressly ratifying the proposed settlement, and a report from Weinberg & Associates, Ltd., certified public accountants, showing the allocation of

out-of-pocket costs and expenses. Additional material has been submitted pursuant to this proceeding.[1]

In their Joint Petition, the three firms requested the following fees:

Robins, Zelle, Larson & Kaplan

 a. Number of attorney hours – 3,921.40
 b. Number of para-professional hours – 1,691.80

| | |
|---|---|
| Total Fees Pursuant to Current Hourly Billing Rates | $508,091.00 |
| Fees Requested | $460,850.00 |

Meyer, Meyer & Pottratz

 Number of attorney hours – 608.80

| | |
|---|---|
| Total Fees Pursuant to Current Hourly Billing Rates | $ 54,792.00 |
| Fees Requested | $ 54,792.00 |

Letness, Marshall, Fiedler & Clapp, Ltd.

 Number of attorney hours – 326.20

| | |
|---|---|
| Total Fees Pursuant to Current Hourly Billing Rates | $ 29,358.00 |
| Fees Requested | $ 29,358.00 |

The firms also sought reimbursement of litigation costs and expenses in the amount of $79,342.09. This amount was compiled by Weinberg and Associates, Ltd., certified public accountants. Certain class members also requested interest on the funds they had contributed prior to the commencement of the litigation. The total interest payment requested was $23,276.19, calculated at a rate of 11% per annum to be paid pro rata to the thirty-one contributing class members.

The attorneys for the class did not seek a multiplier on their time although they were entitled to receive a multiplier under applicable federal law. *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir.1977); *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976); *Lindy Brothers Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973). Counsel only sought compensation figured at their current hourly billing rates. In fact, in order to remain within the 35.5% limit set forth in the notice to the class, the lead counsel law

---

1. In addition to the record that was before the Magistrate, this Court has the benefit of additional affidavits submitted by the three law firms with their appeal papers pursuant to 28 U.S.C. § 636(c)(6), and substantial personal involvement as presiding judge over much of the proceedings.

firm (Robins) actually discounted the lode-star value of its time by $47,241.00.

Letnes, Marshall, Fiedler & Clapp, Ltd. were awarded compensation for only 205.4 hours at $90.00 per hour and for three hours at $60.00 per hour, a total of $18,-666.00. Meyer, Meyer & Pottratz were awarded compensation for only 251.6 hours at $90.00 per hour, and for 110.5 hours at $60.00 per hour, a total of $29,274.00. The Magistrate awarded Robins, Zelle, Larson & Kaplan $449,611.00 in attorneys' fees but noted that the discount of $11,239.00 might be an error, and suggested a motion to reconsider this particular finding might be appropriate.

The standards set forth in *In re Fine Paper Antitrust Litigation,* 98 F.R.D. 48 (E.D.Pa.1983), *modified* 751 F.2d 562 (3d Cir.1984) served as the basis for the decision limiting attorneys fees. The rigid application of *Fine Paper* is inappropriate in this instance. Three law firms handled the case from start to finish. One firm, Robins, Zelle, Larson & Kaplan, served as lead counsel. The two other firms, Meyer, Meyer & Pottratz from Melrose, Minnesota, and Letnes, Marshall, Fiedler & Clapp from Grand Forks, North Dakota directly represented substantial groups of class members, and played an important supplementary role in conducting the litigation. Counsel filed a joint petition which clearly delineated their respective mutually supportive roles in the litigation. For the most part, four lawyers were involved in the representation of the plaintiffs: Stanford Robins and Brent Reichert from the Robins firm who acted as lead counsel; and Mark H. Meyer and Jay H. Fiedler who served in a supplementary capacity based on their direct involvement with grower clients. Overall, Mr. Robins and Mr. Reichert have done an efficient and expeditious job of coordinating and allocating their professional and paraprofessional resources. Mr. Meyer and Mr. Fiedler had a more limited role, but performed an important advisory and liaison function, indispensable to achieving the most effective representation of the class.

The class members received notice of the amount of the attorneys' fees requested and no objections were filed or voiced at the hearing regarding the approval of the settlement and attorneys' fees. The turkey growers in this class are sophisticated businesspeople, who possessed the degree of knowledge and ability sufficient to raise an objection if they believed the fee application was excessive.

In the instant matter portions of the fee requests from Messrs. Meyer & Fiedler were disallowed on the premise that there was insufficient showing that the recorded time benefitted the class. The Magistrate, applying rather literally the measures adopted by the district court in the *Fine Paper* litigation, held that it was only necessary for lead counsel to attend depositions and hearings on behalf of the plaintiffs. Accordingly, the Magistrate found that the presence of Mr. Meyer and Mr. Fiedler at some of the depositions and many of the hearings was duplicative, and of less value to the class than the presence of lead counsel. This approach, under the circumstances of this case, would have the effect of: (1) depriving some of the class members who were most instrumental in initiating the case of the services of their own regular attorney to monitor the activities of lead counsel; (2) depriving lead counsel of the assistance, liaison and insight provided by the local attorneys who more directly represent the class members on a regular basis; and (3) creating the potential in future cases of putting the plaintiffs in class actions at a distinct disadvantage against large defendants who often utilize a legion of attorneys to handle their defense.

This Court presided over many pretrial proceedings, the discussions leading up to the mini-trial as well as the mini-trial itself. This Court's direct observation during these proceedings, together with the material submitted, convinces the Court that the handling of the plaintiffs' case here has been very efficient. Counsel for the class have also made every effort, some extraordinary, to cooperate with the Court, espe-

cially with respect to the mini-trial held in December 1984. This mini-trial, which was held at the Court's request, required all the parties involved to put forth tremendous effort.

The Affidavits submitted in support of this review clearly establish that the efforts of local counsel, Jay H. Fiedler and Mark H. Meyer, directly benefitted the class, and were not merely duplicative of the efforts of the lead counsel. In fact both Messrs. Meyer and Fiedler made considerable efforts not to duplicate the efforts of the Robins law firm and attended hearings, conferences and depositions only when their presence would benefit the class, and was requested by lead counsel. Based upon this Court's knowledge of the involvement of Messrs. Fiedler and Meyer in this litigation and the complicated issues involved, this Court finds that each attorney is entitled to the full amount of fees requested from the common fund. As for the $11,239.00 deducted from the fee application of the Robins firm, this Court finds, consistent with the Magistrate's suggestion, that it was deducted in error and that Robins should be awarded the full $460,-850.00 requested. This award of fees is extremely reasonable when considering the result achieved, the efforts of counsel, the fact that the Robins law firm has discounted the lodestar value of its time by $47,-241.00, and the fact that counsel is not claiming a multiplier of the lodestar.

## GENERAL OBSERVATIONS

The case at bar provides a perfect illustration of a general observation I feel constrained to make. The nation's state and federal courts cannot provide a remedy for every social ill, but my many years on the federal bench have served to reinforce my life-long conviction that when the legislature or the judiciary act to limit access to the courts, they do so at grave peril to our social fabric. One alternative to the orderly resolution of disputes through the courts is violence and anarchy. I believe this observation applies with particular force to the mechanism of the class action because it was designed to provide, in a single expeditious proceeding, a means of redress in those circumstances where many have suffered a common injury.

The contingent fee and the class action are "the poor man's keys to the courthouse." Both vehicles allow the average citizen and taxpayer to have their injuries redressed and their rights protected. Both permit persons of limited resources to obtain competent legal counsel, an essential ingredient in our adversary system of justice. And both are under constant attack.

Time and again in the fields of civil rights, the environment, antitrust, securities, consumer protection, and administrative law, people who have been cheated, deprived of basic rights, physically injured, or otherwise disadvantaged have found their only remedy, or their best remedy, through a class action. The annals of class action case law are replete with examples of lawyers who were willing to commit their personal resources over a substantial period of time to represent a class of injured plaintiffs, motivated only by the incentive that if they succeeded in vindicating the rights of their class clients, they would be paid an attorney's fee at least commensurate with what they would have received for winning an equivalent sum representing but a single client. Often, these suits are brought against companies with resources that allow them to retain squadrons of top-flight lawyers, and all of the technological paraphenalia and human resources that have become characteristic of modern litigation.

The judiciary have not always been receptive to creative and efficient ways to vindicate the rights of large groups of victims. We have now seen that many judges openly and on the record have suspicion and disdain for class actions as a means of redress. Yet, when resourceful and industrious lawyers for the class successfully negotiate tremendous obstacles and achieve a recovery for the class, these same judges undergo a miraculous transformation. Now, with a newly-discovered zest for the rights of the class members,

they feel duty-bound to protect the class from the very attorneys who, at considerable risk, and sometimes at some personal sacrifice, have just brought the case to a successful conclusion. By a rigorous, harsh, and often distorted application of the criteria the courts have developed over the years to weigh the factors that will help to measure the fairness and adequacy of attorneys' fees, they attack the fee applications as though the lawyers for the class have not just vindicated their client's rights, but have, instead, engaged in a systematic exercise to exploit and victimize the claimants. The result is usually to severely reduce and sometimes to deny just compensation to lawyers whose efforts have enhanced the role of the federal courts as an effective tribunal for the resolution of social conflict. Such actions have already gone a long way toward sounding the "death knell" for class actions. *Cf., Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

Those individuals or companies who have or may in the future become defendants have found the "Achilles heel" of the class action. The arrows they use to pierce it are the recent attacks on attorneys' fees awarded to successful plaintiffs' lawyers in class action litigation. If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear.

While it is easy to understand the motivation as to why industry and those who represent large entities attack the class action and the contingent fee, it is more difficult to understand why these obviously self-serving arguments from a rather narrow cross section of society are not rejected out of hand by the judiciary, consistent with its duty to represent the interest of all citizens and litigants. To some extent, the judicial hostility may merely reflect the judiciary's traditional negative reaction to new ideas, procedures and approaches. The law and the legal system is precedent-based, and thus the status quo is comfortable. The rights of the poor and the oppressed were not always protected by the legislature and the judiciary. Our society has grudgingly granted access to legal services and to the courts to redress grievances for the impoverished and the downtrodden. It is rather a new phenomenon that those national companies that have caused widespread harm to hundreds or thousands of individuals throughout the country can now be called to task by these injured citizens, and these same corporate coffers, filled at the injured parties' expense, depleted. It may take some time for the judiciary to adjust to this new phenomenon and enthusiastically accept the responsibility imposed upon it by the promulgators of Fed.R.Civ.P. 23.

We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law. It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit. It is an experience in which few of us have participated. The dimensions of the undertaking are awesome. The time and effort expended test the ability of many lawyers to survive during the lifetime of the action. Some plaintiffs' lawyers have worked on cases before me for as long as ten years and spent a substantial portion of their billable time each year on the effort. At the end they may have received a fee in the millions of dollars. However, averaged out over the years and subtracting taxes and the expenses of a law office, it averages out to a very moderate payment. It certainly does not equate with any bonanza or pot of gold.

A prime example of judicial hostility is the trial court opinion *In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48 (E.D. Pa., 1983). Although the decision was modified on appeal, 751 F.2d 562 (3d Cir. 1984), it serves for many as a focal point for the assault on plaintiffs' attorneys' fees. The initial sentence of the 170-page opinion focuses on a quote that "critics have challenged the altruism of some class action lawyers and charged that the paramount motivation for such litigation was

counsel's desire to generate substantial fees." The proposition is a straw man. Counsel for class plaintiffs are not required to be motivated by altruism. Representation of a class of injured persons is not a *pro bono* act, compelled by a duty to the system of justice. The lawyers for a class of plaintiffs serve justice best when they are able to earn a living at their profession. The concern should be to provide class action plaintiffs' lawyers with incentives enough to adequately and vigorously represent clients within the bounds of professional responsibility. To say that the plaintiffs' bar, or, for that matter, the defendants' bar, is not altruistic says nothing as to whether they perform a vital function in our society. Nor does it speak to the essential fact that to continue to assure that this function will be carried out in the future, the courts must ensure that counsel receive adequate compensation for the effort they put forth, the result they achieve, the benefit they bestow on the class, and the risk they take in prosecuting this type of case.

To consider altruism as an impelling or even important factor in motivating the plaintiffs' bar reflects a myopic or distorted view of the realities of the practice of law. Nonetheless, the results of cases like *Fine Paper* tend to require altruism and *pro bono* work on the part of the plaintiffs' bar if they fail to adequately compensate lawyers for their efforts. Only lawyers with altruistic motives and sufficient independent wealth to support such altruism will be able to engage in this type of litigation on the plaintiffs' behalf. There may be in the profession some lawyers who can support themselves, their families, their law offices, associates, para-legals, secretaries and investigators over periods of at least three years and sometimes as long as 10 years while expenses accrue and no income is forthcoming. These same altruistic lawyers under this hypothesis can look forward to no substantial payoff but do stand in jeopardy of losing their total investment. Even if they win, they stand to lose should the court, with perfect hindsight, decide

that some efforts were unnecessary or unproductive.

The second sentence in the *Fine Paper* opinion purports to be paraphrasing Professor Arthur Miller of Harvard University. The opinion states:

> Indeed it is a "widely held notion" that in settled class actions particularly in the securities and treble damage antitrust context, the great bulk of the money received from the defendants is not distributed to class members, but rather is "devoured by avaricious attorneys" who demand astronomical attorneys' fees.

Citing Miller, *Of Frankenstein Monsters and Shining Knights; Myth, Reality, and the Class Action Problem,* 92 Harv.L.Rev. 664, 667 (1979). The purported paraphrasing from Professor Miller is taken out of context. Miller's statement, in fact, is:

> The empirical evidence also implies that in settled class actions, particularly in the securities and treble damage antitrust contexts, the *great bulk of the money* received from the defendants actually *is distributed to the class members,* in contrast to the widely held notion that the fund is either devoured by avaricious attorneys or consumed by administrative expenses. (Emphasis added)

Miller, *Id.* at 667. Ironically, a common theme throughout this article is that much of the criticism of class actions consists of overstated · assertions and isolated anecdotes that are continuously recycled, and that careful analysis indicates that the class action is accomplishing its essential purposes. *Id.* at 666.

The third sentence of the opinion includes a quote from the Court of Appeals for the Second Circuit (*Van Gemert v. Boeing Co.,* 573 F.2d 733, 735–36 (2d Cir.1978), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)), repeating the frequently used phrase that class actions are "termed by some as lawyers' lawsuits ..." The source of this quote is a magazine article in *Juris Doctor,* "The Class Action Bar—It's All Cat and Mouse" by Frederick Andrews. (January, 1974). Andrews attributes an unidentified young lawyer as

the source of this statement—hardly a source which any court of law should elevate to the status of authority for the exercise of its judicial function. Nonetheless, this statement, the mischaracterization of Miller's statement, and mistaken notions of altruism set the tone for the court's attack on the plaintiffs' bar. They also apparently form the basis for the opinion expressed by the court that there are "widely held, but most unfavorable impressions of the plaintiffs' class action bar." *Fine Paper*, 98 F.R.D. at 67.

Who is dissatisfied with the plaintiffs' bar? How widespread is this dissatisfaction? Certainly the millions of consumers and victims who have received their just compensation through the efforts, competence and risks taken by the plaintiffs' bar are not dissatisfied. In a survey of approximately 900,000 recipients of a six-state settlement in *In Re Antibiotics Antitrust Action*, 410 F.Supp. 706 (D.Minn.1975), the overwhelming majority of the respondents were satisfied with the process and with their amount of refund which, in most cases, was less than $30.00. Most of these respondents understood the necessity and importance of paying the attorneys who procured the award. When asked what would be a fair amount, in percentage terms, to award the plaintiffs' lawyers in this case, fifty percent of the respondents agreed that fees in the 10–25% range would be fair. T. Bartsh, F. Boddy, B. King and P. Thompson, *A Class Action Suit That Worked* (1978), pp. 94–95, 124–26.

I have presided over a great deal of complex litigation and have considered fee applications in numerous cases. See e.g. *McDonald v. Johnson & Johnson*, 546 F.Supp. 324 (D.Minn.1982); *Rajender v. University of Minnesota*, 546 F.Supp. 158 (D.Minn.1982); *Vickerman v. Hennepin County Probate Court*, 543 F.Supp. 165 (D.Minn.1982); *Jorstad v. IDS Realty Trust*, 489 F.Supp. 1180 (D.Minn.1980); *Anderson v. United Paperworks International Union*, 484 F.Supp. 76 (D.Minn. 1980); *Mead v. U.S. Fidelity and Guaranty Co.*, 442 F.Supp. 102 (D.Minn.1977); *Rockler & Co., Inc. v. Minneapolis Share-*

*holders Co.*, 425 F.Supp. 145 (D.Minn.1977); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 680 (D.Minn.1975); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 659 (D.Minn.1974); *In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions*, 410 F.Supp. 669 (D.Minn.1974); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 704 (D.Minn.1975); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 706 (D.Minn.1975); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 722 (D.Minn.1975). My personal experience is that the plaintiffs' class action bar is responsible, ethical, and a credit to the legal profession. Of course, there are examples where a plaintiffs' lawyer has crossed the line, just as there are instances where defense lawyers have engaged in dilatory tatics or other unprofessional behavior. Perhaps some of the attorneys in *Fine Paper* acted improperly. Early judicial intervention can often prevent this type of conduct. In any event it is inappropriate to castigate and penalize a whole class of hard-working professional attorneys on either side because of the isolated transgressions of a few. Even if there were such a "widely held" negative view of the plaintiffs' bar, judges should set the record straight, not perpetuate misinformation and unsubstantiated hearsay detrimental to the professional bar and the operation of justice.

The purpose of the fee award is to compensate the successful lawyer for the benefit he has conferred on the class, for the risk he has taken in prosecuting a frequently long and complex case, and for the hours and expenses he has spent on the case. "Adequate compensation is necessary ... to enable an attorney to serve his client effectively and preserve the integrity and independence of the profession." *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719–20 (5th Cir.1974). *See also Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*, 481 F.2d 1045 (2d Cir.1973).

The attorney has earned his fee. He does not stand as a beggar seeking charity or, for that matter, judicial altruism. It is the duty of the court to adequately compensate. Just as too great an award might be unfair to the class members, too small an award is detrimental to these lawyers, the legal profession, and society at large.

Certainly lawyers should be required to document their fee requests, but the courts must not place an insurmountable or unfair burden on counsel. In the first place, we have not compensated counsel for filing their fee applications. In a sense, we have forced them to donate their time in order to recover what is rightfully theirs. If we place too heavy a burden on attorneys to demonstrate why each telephone call, conference or memorandum actually had some real benefit to the class, we create a morass. "It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *City of Detroit v. Grinell Corp.*, 495 F.2d 448, at 473 (2d Cir.1974); *Merola v. Atlantic Richfield Co.*, 493 F.2d 292 (3d Cir.1974). Competent counsel should leave no stone unturned in these large cases. Some lines of inquiry may lead to dead ends and, in retrospect, may appear to be of no benefit. At the planning stage, the inquiry may have appeared to be very necessary to competent and thorough counsel. How can a court be in a position to second guess counsels' litigation strategy?

By and large, when an attorney represents to the court that he or she has searched his client's files and has produced all documents responsive to a discovery request, we accept the representation at face value, as we do other representations of counsel throughout the trial process. Why do we not treat the plaintiffs' attorneys' representations that the work was done for the benefit of the class in the same manner?

To what extent should the federal judiciary become involved in the tactics and distribution of work by plaintiffs' attorneys in prosecuting one of these large cases? Are the courts really in a position to know what type of work is better suited for a senior partner as opposed to an associate? It would perhaps be more cost effective if all senior partners engaged in research on the cases they are litigating. That added efficiency underlies the rationale for paying senior partners at a higher rate. Yet, some federal courts take the view that only associates, those who are not going to appear in court and argue the case, should engage in research.

Some federal judges have concluded that the second attorney at a deposition is not valuable and should not be paid as much as the person conducting the deposition. It is my experience and the experience of many seasoned litigators who, in fact, take depositions, that the second person at the deposition may have information and background which makes their attendance extremely valuable. Furthermore, in complex litigation involving lawyers from different law firms representing a wide variety of clients, the analogy to the traditional junior associate second chairing his or her senior partner, both representing one client or point of view, is inappropriate.

Competent plaintiffs' counsel are in the best position to determine how their time and the time of their associates can best be allocated. I know of no competent lawyers who will choose to leave their law offices, buy an airline ticket or take a lengthy drive in order to travel to another city and sit in on a deposition, unless they believe that their presence at the deposition is necessary. I cannot conceive of a lawyer who would make such a decision solely for the purpose of building up billable hours on a contingent fee case, with no assurance of obtaining any fee at all if the case is not successfully concluded.

Attorneys representing class members take on tremendous responsibility. They have an obligation to represent all of the interests of their clients in a competent and vigorous representation. These clients are entitled to the same quality of representation as the defendant would expect from its

lawyers. As evidence of the appropriate standard of practice and the value of representation, it might be useful to consider what a defendant is willing to pay for and how many lawyers a defendant is willing to send to represent it at depositions or court appearances. If there is just one defendant and one law firm involved, the need for multiple counsel may be less compelling on the defense side of the case. Nonetheless, it certainly is not unusual, and in fact, is the accepted practice that numerous defense lawyers appear at depositions and hearings. In the Antibiotics Antitrust Litigation, this Court was called upon to pay plaintiffs' counsel from common funds equalling millions of dollars. This Court, there on the record, inquired of defendants' counsel concerning the number of attorneys being employed at any one time in the defense of the class action before the Court. One New York defense firm disclosed that it had seventeen lawyers and seventeen para-legals billing hours to the defendants at all times. The several other defense firms proferred similar estimates which caused the Court to conclude that as many as 250–300 lawyers (not including dozens of in-house counsel) were working together to defend these cases.

The defense lawyers in these cases are frequently highly competent, highly compensated and provided with a substantial budget to defend these cases. The Federal Courts should not encourage a standard of practice for the plaintiffs' bar that deprives the absent class members of the quality representation necessary to fully and vigorously prosecute a case against such an adversary.

### CONCLUSION

My modification of the Magistrate's Order in the instant case is not, in and of itself, a substantial alteration of the awards made by the Magistrate. Its importance relies on the court's having summarized its experience and in articulating its considered judgment concerning the real mischief that results from the relatively new practice of cutting fees of class action

lawyers with the stated purpose of protecting a class. For four years the three law firms representing the class labored for hundreds of hours without compensation to win a settlement for this class of turkey growers. The lawyers agreed among themselves to limit their total fees to 35.5 percent of the recovery—a share which is surely commensurate with the prevailing fees in non-class action suits. As a result of their self-imposed limitation, the lawyers did not seek a multiplier, and in fact, had to discount their lodestar fee. The plaintiffs' lawyers have demonstrated unswerving dedication to the cause of the class; there was no objection from any class member to the fees; and the Magistrate observed that the work was surely deserving of a multiplier as high as a factor of two. The *Fine Paper* analysis subjects the fee applications to the sort of scrutiny more appropriate to the cross-examination of an adverse expert in a jury trial. The working assumption of the approach in *Fine Paper* is that when the lawyers for the class record their time, as they routinely do for every other client, by entering the date and activity without a self-explanatory rationalization of the benefit of the activity to the client, the phone calls, correspondence, meetings, etc., duly reflected must be presumed to be frivolous or wasteful. For the reasons given, the assumption was not warranted here.

The Court, therefore, concludes that:

1. A $460,850.00 fee award to the Robins law firm is fair and reasonable and represents an equitable charge to benefitted class members;

2. A $54,792.00 fee award to the Meyer law firm is fair and reasonable and represents an equitable charge to the benefitted class members; and

3. A $29,358.00 fee award to the Fiedler law firm is fair and reasonable and represents an equitable charge to benefitted class members.

### LITIGATION COSTS AND EXPENSES

The Joint Fee Petition also contained a prayer for reimbursement of litigation

costs and expenses, and for payment of interest to thirty-one growers who contributed to the original litigation fund. Specifically, the three law firms representing the class requested reimbursement for the following out-of-pocket costs and expenses:

| | |
|---|---|
| Robins, Zelle, Larson & Kaplan | $21,177.22 |
| Meyer, Meyer & Pottratz | $ 1,824.70 |
| Letnes, Marshall, Fiedler & Clapp, Ltd. | $ 3,121.92 |
| Thirty-one Contributing Class Members (Includes 11% interest per annum) | $78,476.54 |

From a review of the original fee petition, the record, personal experience and involvement with this case and the supplemental affidavits, it is clear to this Court that the expenses and costs advanced by all three law firms were necessary, reasonable and benefitted the class. Furthermore, these three law firms have kept these costs and expenses at a minimum, especially when one considers the length of the litigation. Finally, the $11,239.00 deducted from the out-of-pocket request of the Robins law firm was in error. This amount was not part of the expenses sought by the Robins law firm and does not reflect an overlap of the out-of-pocket expenses sought.

 Although the Court has a duty under Rule 23 of the Federal Rules of Civil Procedure to review the reasonableness of the request by class counsel for reimbursement of their costs and expenses, it must not be so overzealous as to deny legitimate claims for the reimbursement of out-of-pocket costs and expenses. To do so, would likewise prevent representative plaintiffs and their class action counsel from being reimbursed for legitimate costs and expenses. This would likely discourage both the filing of and vigorous prosecution of legitimate claims by those who have suffered.

The Court, therefore, concludes that:

1. $1,824.70 is a reasonable sum for reimbursement to the Meyer law firm for out-of-pocket costs and expenses.

2. $3,121.92 is a reasonable sum for reimbursement to the Fiedler law firm for out-of-pocket costs and expenses.

3. $21,177.22 is a reasonable sum for reimbursement to the Robins law firm for out-of-pocket costs and expenses.

4. $78,476.54 is a reasonable sum for reimbursement (includes 11% interest) to those thirty-one class plaintiffs who initially advanced the sums used for out-of-pocket costs and expenses.

## ORDER

The Court, therefore, Orders That:

1. The proposed settlement, as set forth in the Settlement Agreement of June 18, 1985, between the parties through their respective counsel, is hereby approved pursuant to Fed.R.Civ.P. 23(e).

2. Defendant is hereby directed to pay out of the total settlement of One Million Five Hundred Fifty Thousand Dollars ($1,550,000.00), pursuant to Paragraph 4 of the Settlement Agreement, attorneys' fees to counsel for the class as follows:

| | |
|---|---|
| Meyer, Meyer & Pottratz | $54,792.00 |
| Letness, Marshall, Fiedler & Clapp, Ltd. | $29,358.00 |
| Robins, Zelle, Larson & Kaplan | $460,850.00 |

3. Defendant is hereby directed to pay out-of-pocket costs and expenses out of the total settlement of One Million Five Hundred Fifty Thousand ($1,550,000) pursuant to Paragraph 4 of the Settlement Agreement as follows:

| | |
|---|---|
| Meyer, Meyer & Pottratz | $ 1,824.70 |
| Letness, Marshall, Fiedler & Clapp, Ltd. | $ 3,121.92 |
| Robins, Zelle, Larson & Kaplan | $19,195.10 |
| (Robins, Zelle, Larson & Kaplan shall apply the balance of plaintiffs' expense fund, $1,982.12, to the costs they have advanced.) | |

4. Defendant is hereby directed to pay out of the total settlement of One Million Five Hundred Fifty Thousand Dollars ($1,550,000), pursuant to Paragraph 4 of the Settlement Agreement, the sum of $78,476.54 to Robins, Zelle, Larson & Kaplan to be disbursed, in turn, as principal and interest to reimburse those class members who contributed initially to pay out-of-pocket

1382

costs. Robins, Zelle, Larson & Kaplan shall deposit this payment in its client trust account and shall promptly remit to each of the original contributing growers the principal and interest on their contribution. Upon completion of the disbursement to the class members involved, Robins, Zelle, Larson & Kaplan shall file a certificate with the Court stating that it has complied with this provision of the Order.

5. Defendant shall determine, pursuant to Paragraphs 4, 7 and 8 of the Settlement Agreement, the amount payable to each member of the class shown on the Class List. The payments due to those claimants whose claims are disputed, shall be paid in accordance with Paragraph 8 of the Settlement Agreement.

6. The balance of the settlement proceeds shall be paid pursuant to Paragraphs 4 and 7 of the Settlement Agreement.

7. Payment by defendant pursuant to this Order shall release defendant from any liability to a class member, or a successor or assign of the class member, based on the 1980 Cooperative Marketing Pool Agreement or arising out of the operation of the 1980 Cooperative Marketing Pool.

8. This Court shall retain jurisdiction to resolve any matters that arise pursuant to the terms of this Order.

LET JUDGMENT BE ENTERED ACCORDINGLY.